IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

ANTONIO HUNTER,                    )
                                   )
          Plaintiff,               )
                                   )
v.                                 )   No. 3:21-cv-00271-NJR
                                   )   East St. Louis, Illinois
ILLINOIS DEPARTMENT OF             )
CORRECTIONS, et al.,               )
                                   )   *MOTION FOR*
          Defendants.              )      *PRELIMINARY INJUNCTION*


TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS
BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
UNITED STATES CHIEF DISTRICT JUDGE

MAY 6, 2022


Stephanie Rennegarbe, RDR, CRR, CBC
IL CSR #084-003232
750 Missouri Avenue
East St. Louis, IL  62201
618-482-9226
Stephanie_Rennegarbe@ilsd.uscourts.gov

*Proceedings recorded by mechanical stenography; transcript*
*produced by computer-aided transcription*

```
1    APPEARANCES:

2    FOR THE PLAINTIFF:       Lindsay Hagy, Esq.
                              Stephen H. Weil, Esq.
3                             Loevy & Loevy
                              311 N. Aberdeen Street
4                             Third Floor
                              Chicago, IL  60607
5                             312-243-5900
                              lindsay@loevy.com
6                             weil@loevy.com

7
     FOR THE DEFENDANTS:
8    (For IDOC)               Christine G. McClimans, Esq.
                              Assistant Attorney General
9                             500 South Second Street
                              Springfield, IL  62701
10                            618-236-8621
                              christine.mcclimans@ilag.gov
11
     (For Wexford             Abbey A. Fritz, Esq.
12      & Dr. Ritz)           Sandberg, Phoenix & vonGontard
                              600 Washington Avenue
13                            15th Floor
                              St. Louis, MO  63101-1313
14                            314-231-3332
                              afritz@sandbergphoenix.com
15

16

17

18

19

20

21

22

23

24

25
```

1               I N D E X

2

**WITNESS CALLED TO TESTIFY:**                    **PAGE**

3

DR. PERCY MYERS
4    DIRECT EXAMINATION BY MR. WEIL              6
     EXAMINATION BY THE COURT                    9
5    CROSS EXAMINATION BY MS. FRITZ              11
     REDIRECT EXAMINATION BY MR. Weil            18

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Proceedings began at 9:34 a.m.)

2                         ****************

3           COURTROOM DEPUTY:  The United States District Court

4    for the Southern District of Illinois is now in session.

5    Chief Judge Nancy Rosenstengel presiding.

6           The matter of *Hunter v. Illinois Department of*

7    *Corrections, et al.,* case #21-cv-271, is called for a Motion

8    Hearing.

9           Will the parties please identify themselves for the

10   record?

11          MR. WEIL:  Stephen Weil for the Plaintiffs.

12          MS. HAGY:  Your Honor, Lindsay Hagy also for the

13   Plaintiffs.

14          THE COURT:  Good morning, Counsel.

15          MS. McCLIMANS:  Christine McClimans.  I'm here for

16   IDOC and the IDOC Defendants.

17          THE COURT:  Good morning.

18          MS. FRITZ:  Your Honor, Abbey Fritz on behalf of

19   Wexford and Dr. Ritz.

20          THE COURT:  All right.  Good morning, everyone.

21          So, this matter is set today on a Motion for

22   Preliminary Injunction.  Mr. Hunter is seeking injunctive

23   relief in the form of referral for a surgical consultation to

24   correct his rectal prolapse.  Now, I note the hearing had been

25   continued because there had been a consultation scheduled, and

1    Plaintiff just filed a status yesterday indicating that that

2    has not happened, even though we thought it was going to

3    happen in March.  So, talking to Counsel before the hearing,

4    we thought it would be best to start with testimony from Dr.

5    Myers.  I understand that records -- additional records

6    from -- medical records of Mr. Hunter were introduced within

7    the last few hours or so, and so I really want to get to the

8    bottom of what's going on and if this motion is moot or not or

9    if we need to proceed to it.

10           So, Dr. Myers, we are going to start with you.

11           And, Deana, if you would administer the oath, please.

12           COURTROOM DEPUTY:  Dr. Myers, would you please raise

13   your right hand?

14           (Plaintiff witness, Dr. Percy Myers, sworn.)

15           COURTROOM DEPUTY:  Thank you.  And would please state

16   your first and your last name for the record?

17           DR. MYERS:  Percy Myers, M-Y-E-R-S.

18           COURTROOM DEPUTY:  Thank you.

19           THE COURT:  So, Mr. Weil, would you like to begin

20   with questioning Dr. Myers?

21           MR. WEIL:  Sure, I'm happy to, Judge.  And I will say

22   we got these records about, it looks like, 59 minutes ago, so

23   I am -- This is not going to be a sharpened examination in any

24   sense.

25

DIRECT EXAMINATION

BY MR. WEIL:

Q.  Dr. Myers, as you know, we are here for the case of
Antonio Hunter, who there's a preliminary injunction in place
regarding getting surgery, or at least a surgical consult for
Dr. Hunter's rectal prolapse.

        I think we received some records this morning going
through I believe it's April 13th.  Are you familiar with Mr.
Hunter's care through April 13th?

A.  Somewhat.

Q.  Okay.  Can you tell us the course of his care running, I
would say, between mid March and April 13th, to the best -- as
best you know, and what referrals have been made and the
status of those referrals?

A.  He was diagnosed with a rectal prolapse and after the
diagnosis was made referred to a surgeon for evaluation, and
after the evaluation he had been scheduled to have surgical
repair.

Q.  Do you know the date -- So, by that I take it that you
mean that the surgeon recommended surgery for Mr. Hunter's
rectal prolapse, is that right?

A.  Correct.

Q.  The date that we have for that recommendation, as best we
can tell from the medical records we just received, is April
13th of 2022.  Is that consistent with your understanding?

1    A.  It seems fair.

2    Q.  Okay.  We don't have any action in the records that we see

3    after that.  So, since April 13, 2022, we don't see any action

4    to refer -- to actually refer or schedule Mr. Hunter for

5    surgery or otherwise take steps to effectuate the surgery that

6    was recommended by the surgeon.

7          Is that accurate, that Mr. Hunter hasn't been

8    actually scheduled for surgery?

9    A.  He does not actually have a scheduled date.  There is a

10   process underway to confirm a date for his procedure.

11   Q.  I'm going to correct myself.  I may introduce as an

12   exhibit the documents that we have just received.  I guess I'm

13   not able to share my screen.

14          And, I apologize.  The last date that we have is

15   April 21st.

16          When you refer to the process to approve, are you

17   referring to a process within Wexford for approval or a

18   process that -- a process outside of Wexford that goes beyond

19   the collegial review or utilization management process?

20   A.  Wexford.

21   Q.  Okay.  So, there was a recommendation for surgery, I

22   believe, on April 13th.  And, has Wexford approved that

23   surgery since then?

24   A.  If not already, they will be.

25   Q.  Why has it not been approved since April 13th, do you

1    know?

2    A.  Once the request is submitted I have no control over what

3    happens subsequent to that.

4    Q.  Typically, if I understand the process -- and you can

5    correct me if I'm wrong, Dr. Myers -- there's typically a

6    collegial consult or collegial review every week for every

7    facility.  So, if something has been recommended for April

8    13th, is that not the case?

9    A.  No.

10   Q.  Okay.  How often does a collegial consult occur for

11   Pinckneyville?

12   A.  We don't have -- Previously there was a session designated

13   for the collegial reviews, but that's not been in existence

14   for months.

15   Q.  Do you know when the surgeon's recommendation was sent to

16   Wexford corporate for approval, or whether --

17   A.  No.  No, they are normally sent, but I'm not notified when

18   they are sent.

19   Q.  So, do you know the status of the approval of the

20   surgeon's recommendation for surgery at this point?

21   A.  No.

22   Q.  I'm --

23   A.  Go ahead.

24   Q.  I'm not sure, Judge, that I have other questions right

25   now.

1              Well, Dr. Myers, you were starting to say something.

2    Can you tell us anything you know about the status of the

3    approval beyond what we've talked about?

4    A.  I can pretty much guarantee you there will be an approval,

5    but it's just --

6    Q.  Do you know when?

7    A.  No, I don't.

8    Q.  You don't know when that will occur.  Do you have any

9    understanding why it wouldn't have occurred yet?

10   A.  No.

11   Q.  Just one moment.

12             MR. WEIL:  I'm not sure that I have any other

13   questions for Dr. Myers if he doesn't have any idea of when

14   surgery will be approved.

15

16                          EXAMINATION

17   BY THE COURT:

18   Q.  All right.  Dr. Myers, why do you say -- why do you think

19   certain that it will be approved?

20   A.  Because this is a surgical procedure that has no reason

21   not to be approved.  Once it was requested for him to have the

22   procedure, then we will be moving forward for having the

23   procedure done.

24   Q.  Do you know anything about where it will be done or who

25   will do it?

1    A.   It will be performed in St. Louis at one of the university

2    hospitals there.

3    Q.   Okay.  So, first it has to get approved, and then it has

4    to get scheduled?

5    A.   Yes, because when -- because of the billing process there

6    has to be an approval number attached to every submission.

7    So, once his request is submitted and approved, then it is

8    assigned an approval number.  So, when the person who contacts

9    the university and says, "I would like to have such and such a

10   procedure done," it will relay that authorization number to

11   that facility so that there is a tracking process.

12   Q.   Okay.  And do you know how far out surgeons are scheduling

13   this type of surgery?

14   A.   Don't know that, but just for -- for an example, if we

15   submit a request now for a person to be evaluated by a

16   gastroenterologist, they won't be seen until the middle or end

17   of July.

18   Q.   But that's just for an appointment, not for surgery,

19   correct?

20   A.   Right, right, right.

21            THE COURT:  All right.  Ms. McClimans, do you have

22   any questions for Dr. Myers?

23            MS. McCLIMANS:  No, Your Honor.

24            THE COURT:  Ms. Fritz, Mr. Harms, any follow-up?

25            MS. FRITZ:  Yes, Your Honor.

```
 1
 2                           CROSS EXAMINATION
 3   BY MS. FRITZ:
 4   Q.  Dr. Myers, are you aware of whether or not Mr. Hunter has
 5   already been seen by a colorectal specialist?
 6   A.  Yes, he was.
 7   Q.  Do you know, to your recollection, when he was seen?
 8   A.  No, I don't.
 9           MS. FRITZ:  Your Honor, may I share my screen?
10           THE COURT:  I think Deana can make that happen.
11           COURTROOM DEPUTY:  Yes, give me a moment.  All right.
12   Give it a try now.
13           MS. FRITZ:  Can everybody see my screen?
14   Q.  (By Ms. Fritz) Okay.  Dr. Myers, can you see the document
15   up on the screen?
16   A.  Yes, I can.
17   Q.  Okay.  Is this a document that you are familiar with?
18   A.  Yes.
19   Q.  Okay.  Is it your handwriting?
20   A.  Yes.
21   Q.  Up on the top there, does it look like this is a medical
22   record for a Mr. Antonio Hunter?
23   A.  Yes.
24   Q.  Okay.  Can you just explain -- Is this a document that you
25   have reviewed in preparation for today?
```

```
 1   A.  No, not really.

 2   Q.  Okay.  Do you recall having an appointment with Mr.

 3   Hunter?

 4   A.  Yes, I remember.

 5   Q.  Can you -- On the left hand of the page, is that where

 6   your Plan of Care was written?

 7   A.  No, the Plan of Care is on the right-hand side.

 8   Q.  My apologies.  Thank you.

 9           THE COURT:  Can you make that bigger, Ms. Fritz, zoom

10   in or something?

11           MS. FRITZ:  There we go.  Is that better?

12           THE COURT:  Thank you.

13   Q.  (By Ms. Fritz) Dr. Myers, can you please tell me what your

14   Plan of Care was in this note for Mr. Hunter?

15   A.  Yes, that request was submitted for him to be evaluated by

16   a colorectal surgeon.

17   Q.  And can you tell me what date this note was?

18   A.  March 1st of this year, '22.

19   Q.  I'm going to stop.

20           Dr. Myers, do you recognize this type of document?

21   A.  Yes, it is.

22   Q.  And what type of document it is?

23   A.  That's the request for an evaluation that -- This is

24   essentially a collegial document.  And when a patient is seen

25   and a referral is thought necessary, then we complete this
```

1    form and then we submit it to the person who does the -- who

2    contacts the outside provider and essentially the scheduler.

3    So, they contact out the staff provider to make the

4    appointment for that patient to be seen by a consultant.

5    Q.  The top part, though, is the black handwriting.  Is that

6    your handwriting?

7    A.  Yes, it is.

8    Q.  And did this look to be a collegial referral for Mr.

9    Antonio Hunter?

10   A.  Yes, it is.

11   Q.  Okay.  So, is this the referral that you were talking

12   about earlier to be seen by a colorectal surgeon?

13   A.  Yes.

14   Q.  The bottom half of this note, is that your handwriting?

15   A.  No.

16   Q.  Okay.  Whose handwriting, to your knowledge, would this

17   be?

18   A.  That would be the person who represents the outside

19   consultant.

20   Q.  Okay.  So, in your experience and your knowledge, this

21   would indicate that he was already seen by an outside provider

22   based on the recommendation that you made above?

23   A.  Yes.

24   Q.  Okay.  And can you tell me what the date is on this

25   outside provider's notation?

```
 1   A.  March 21st of this year.

 2   Q.  Does that refresh your recollection of when Mr. Hunter was

 3   seen --

 4   A.  Yes.

 5   Q.  -- by a colorectal specialist?

 6   A.  Yes.

 7   Q.  Do you have any independent knowledge of what that

 8   colorectal specialist recommended in March of 2020 -- I'm

 9   sorry, excuse me -- 2022?

10   A.  Just from what I just read.

11   Q.  I'm going to pull up one more document.

12            Dr. Myers -- I'm sorry.  It rotated on me here.

13            Here we go.  My apologies.

14            All right.  Dr. Myers, can you see the document that

15   I have up on the screen, maybe?

16   A.  Yes, I can.

17   Q.  Okay.  That top part, is that your handwriting?

18   A.  Yes, it is.

19   Q.  Okay.  What's the date of that document?

20   A.  Can you enlarge it just a little bit or go up to it?

21   Q.  I can try to enlarge it as long as it doesn't scroll on

22   me.

23   A.  Okay.  It looks like it's 3/30/22.

24   Q.  Okay.  And did you make a recommendation on that date?

25   A.  Yes.
```

1    Q.  What was the recommendation?

2    A.  A Collegial was submitted for follow-up with a colorectal

3    surgeon in St. Louis and we'll need to send office notes from

4    the previous evaluation.

5    Q.  Do you know -- Do you recall why you made that

6    recommendation for him to be seen by a second specialist?

7    A.  Because the one he was initially evaluated by determined

8    that he needed a more specialist to perform the procedure.

9    Q.  Now, there's a note at the very bottom here.  Is that your

10   handwriting, the very last note?

11   A.  No, it's not.

12   Q.  Okay.  Do you know whose handwriting that is?

13   A.  Yeah, that's the staff assistant.

14   Q.  Okay.  And can you read what that -- Is that something

15   that you would see often is notes from staff assistants in the

16   medical records?

17   A.  Yes.

18   Q.  Okay.  Can you read to me what that note says and the

19   date?

20   A.  "Approved at Collegial on March 3rd of this year for

21   urgent colorectal surgeon evaluation."  And then it tells you

22   who was the staff assistant, Pam Keene.

23   Q.  Then what was the date of that entry?  Can you read it?

24   A.  4/11/22.

25   Q.  Okay.  I'm enlarging this one a little bit better so you

1    can see it.

2          Does that look like -- Does this also appear to be a

3    medical record for Mr. Antonio Hunter?

4    A.  Yes, it is.

5    Q.  Does that look like the same handwriting from the staff

6    assistant we saw earlier?

7    A.  Yes, it is.

8    Q.  Can you read what this medical entry says?

9    A.  Yeah.  "Approved in Collegial for a colorectal surgeon on

10   4/13/22."

11   Q.  Okay.  So, earlier you were talking about approval.  So,

12   is it your understanding that Mr. Hunter is approved for that

13   follow-up at Barnes-Jewish Hospital that you recommended at

14   the end of March?

15   A.  Correct.

16   Q.  Okay.  Do you know whether or not that authorization

17   number that you were talking about earlier has been provided?

18   A.  I'm not sure if it had been at that time.

19   Q.  Okay.  As you sit here today, do you know if an

20   authorization number for that second referral to BJC has been

21   provided?

22   A.  Most likely it has been, yes.

23   Q.  Do you know if there is a follow-up with BJC that is

24   scheduled for Mr. Hunter?

25   A.  I don't know.

1    Q.  Earlier you -- I'm going to try to increase this a little
2    bit so it's easier to read.
3          Can you read this document?
4    A.  Yes, I can.
5    Q.  Do you know what this document is?
6    A.  Yes, that's the authorization number that I had previously
7    mentioned.
8    Q.  Okay.  So, it appears that there has been an approval and
9    an authorization number entered for Mr. Hunter for the BJC
10   colorectal surgeon?
11   A.  Yes.
12   Q.  Okay.  To your knowledge, is this the referral for a
13   surgery consult or is this a referral to have surgery?
14   A.  That's probably the referral to be evaluated by the
15   colorectal surgeon in St. Louis.
16   Q.  You are not sure when that's scheduled?
17   A.  No.
18   Q.  Based on the documents we have seen today, do you have any
19   doubt that Mr. Hunter will receive that follow-up with the
20   colorectal surgeon at BJC?
21   A.  No doubt whatsoever.
22   Q.  To clarify, this is at least his second time he will be
23   going out to see a colorectal specialist for his rectal
24   prolapse condition, correct?
25   A.  Correct.

1    Q.  I believe that's all the questions I have.  Thank you.

2    A.  Okay.

3             THE COURT:  Any follow-up, Mr. Weil?

4             MR. WEIL:  Just a few.  I may need to share my

5    screen, but hopefully I won't.

6

7                          REDIRECT EXAMINATION

8    BY MR. WEIL:

9    Q.  Dr. Myer, you saw on multiple documents that you were just

10   shown that *urgent* was circled for evaluation?

11   A.  Yes.

12   Q.  What does that mean?

13   A.  A priority.  For instance, if I turn in, say, five

14   requests in one day, you either prioritize them by putting in

15   *urgent* or specifically *nonurgent*, and his was marked *urgent*.

16   Q.  And does that mean his condition needs to be attended to

17   emergently?

18   A.  No.

19   Q.  What does it mean?

20   A.  It means that of those five, that was the one that you

21   should look at first and then submit a request in first.

22   Q.  And, so, the understanding for Mr. Hunter's medical

23   evaluation is that his condition is urgent, is that right?

24   A.  No.

25   Q.  His condition is not urgent, but *urgent* is circled?

1  A.  Yes.

2  Q.  Okay.  Do you expect that when a patient's condition is

3  coded as urgent or his medical need is coded as urgent that

4  there's a lengthy wait for recommendations that are made based

5  on that coding?

6  A.  No.

7  Q.  Go ahead.

8  A.  Like I said, you know, you could turn -- For instance, if

9  a person comes in with a hernia or a person comes in that has

10  some kind of a skin lesion, those aren't urgent conditions,

11  you know.  So, I'm not sure how soon they can be seen by the

12  outside provider, but those aren't the ones that take priority

13  to be submitted to Wexford to get authorization number.

14        MR. WEIL:  May I -- If I may, I would just like to

15  share my screen.

16        THE COURT:  Sure.  Deana, can you make that happen?

17        COURTROOM DEPUTY:  Yes, he's already a cohost.

18  Q.  (By Mr. Weil) Let me see if I can get the right one here.

19        I'm going to do my level best to make this readable.

20        So, this is Bates number 695.  It was produced to us

21  earlier this morning, and you were just discussing this

22  document with Ms. Fritz.

23        Can you see it on the screen, Dr. Myers?

24  A.  Yes.

25  Q.  So, this is an approval, if I understand it correctly,

1    because there's an authorization to have Mr. Hunter evaluated

2    by a surgeon by -- on April 7th, and that's approved on April

3    13th, correct?

4    A.   Maybe that was the date that it was forwarded to, but I

5    don't know the exact approval date.

6    Q.   And this is -- This is a document that's transmitted from

7    Utilization Management to the Healthcare Unit.  Do you see

8    that at the upper left-hand corner of the document?

9    A.   Correct.

10   Q.   So, this is not a document that's being -- And,

11   Utilization Management refers to Wexford corporate, is that

12   right?

13   A.   Yes.

14   Q.   Healthcare Unit refers to the Pinckneyville Healthcare

15   Unit, is that right?

16   A.   Correct.

17   Q.   This does not suggest any sort of transmission to

18   Barnes-Jewish, BJC, which I believe is Barnes-Jewish Medical

19   Center or Barnes-Jewish Hospital, is that right?

20   A.   Correct.

21   Q.   Are you -- Do you know whether any transmission has

22   occurred of this approval to Barnes-Jewish Hospital?

23   A.   No.

24   Q.   Would that be Wexford's job, as in Wexford corporate, or

25   would that occur from the Pinckneyville Correctional Center?

1   A.   At Pinckneyville.

2   Q.   Okay.   Notwithstanding this transmission, you don't have

3   any idea whether that consult has actually been requested by

4   folks at Pinckneyville Correctional Center?

5   A.   Only after review of the progress notes.

6   Q.   Okay.   What do you mean by that?

7   A.   Okay.   So, the process is, as we have -- I will try to

8   reiterate and simplify it.   But, a patient comes into the

9   examination room like Mr. Hunter does, they need to have an

10  outside consultation, you fill out the Collegial form, you

11  give it to the office associate, they will transmit that to

12  Wexford for an authorization number.   Wexford provides an

13  authorization number that is transmitted back to the office

14  associate, at which time the office associate would then

15  contact the outside provider to set up the appointment.

16  Q.   Okay.   Let me just stop you there, Dr. Myers.   I don't

17  mean to interrupt you, but the transmission back to the office

18  associate that you just referred to, that's the document that

19  we are looking at on the screen, right?

20  A.   Correct.

21  Q.   Okay.   And, so if that happened on April 13th, would the

22  transmission, the contacting of that outside provider be

23  reflected in Mr. Hunter's medical records anywhere?

24  A.   It may be reflected in the progress notes, --

25  Q.   Okay.

1   A.   -- but then again it may not be.

2   Q.   Are you familiarized -- It may or may not be in his

3   medical records?

4   A.   Right.

5   Q.   Okay.  And, are you familiar with Mr. Hunter's medical

6   records from April 13th, to the present?

7   A.   Not really.

8   Q.   Okay.  Who's -- And who would be contacting the outside

9   provider?

10          Let me ask this question first:  How long would it

11   take to contact the outside provider once you receive this

12   referral.

13   A.   I don't know.

14   Q.   Okay.  Who knows that?

15   A.   The office associate.

16   Q.   Is there any -- Is there anything beyond picking up the

17   phone or sending an e-mail that you need to do to make this

18   referral?

19   A.   You mean that the office associate does?

20   Q.   Yes.

21   A.   Once they get the authorization they will contact the

22   outside provider by phone.

23   Q.   Okay.  The medical records we have just received are 15

24   pages long.  I don't want to take up the Court's time, but I

25   do want to just page through them very quickly and see if you

1    see any indication that Barnes-Jewish Hospital or any other

2    outside medical provider has been contacted to actually set up

3    this surgical consult, okay?  So, I'm going to scroll from the

4    top and go down, and you can slow me down any time that you

5    see any sort of contact being made.

6            Are you able to see the document, Dr. Myers?

7    A.  Yeah.  Would you back it up just slightly?  Wait; too far.

8            Oh, this is the one we just reviewed, though.

9    Q.  I don't think there's anything on here that postdates

10   April 13th, so this appears to be an irrelevant hypertension

11   exam.  Next page, there's a note here.  You reviewed this

12   note, as well, dated April 21st, that something was approved

13   on April 13th.  But, did you see any indication that the

14   outside medical provider was actually contacted?

15   A.  No, just that it was approved.

16   Q.  Okay.  This document appears to be dated in March, so that

17   wouldn't reflect any sort of approval, right?

18   A.  Right.

19   Q.  Okay.  This document is also dated March, so that wouldn't

20   reflect any sort of approval on April 13th, right?

21   A.  Right.

22   Q.  Okay.  This document I see also dated March, do you see

23   that, so this also would not reflect an approval or contact,

24   right?

25   A.  It's a contact from the outside provider.

1    Q.  I am referring to a contact to the outside provider after

2    April 13th, when the surgical consult was approved.

3    A.  Wait.  With a surgical consult, or the actual surgical

4    procedure?

5    Q.  I am referring to this approval.  What is this approval on

6    695?  This is the same authorization you reviewed with

7    Wexford's counsel and that we talked about, right?

8    A.  Okay; yeah.

9    Q.  That's what I'm talking about.

10   A.  Okay.  This is the approval for him to go to St. Louis for

11   an evaluation.

12   Q.  Okay.  So, I'm just trying to figure out whether -- You

13   are saying that once you get this approval, that it's someone

14   at Pinckneyville's responsibility to actually contact the

15   outside hospital to make this appointment happen, and I am

16   trying to find anywhere in the medical records where this --

17   did someone at Pinckneyville actually contact the outside

18   hospital once they received this approval.

19        Do we understand each other, Dr. Myers?

20   A.  Yes.

21   Q.  Okay.  I'm just going to go back up here.

22        We will start off again, backtrack a moment.  We

23   talked about this April 21st note, which postdates April 13th,

24   but you don't see anything in here indicating that anybody

25   outside was contacted, correct?

1    A.   Normally they just say that it has been approved, --

2    Q.   Okay.

3    A.   -- because they don't want to be too descript as to when

4    the patient is, because the patient has access to the records.

5    Q.   But, there's no indication here that anybody's contacted

6    Barnes-Jewish Hospital to actually make this appointment

7    happen, is that right?

8    A.   As I previously stated, an appointment can be made without

9    making a notation in the records.

10   Q.   Well understood, Doctor.

11   A.   Okay.

12   Q.   I'm just saying to see -- You said it could be or might

13   not be, so I'm just trying to find anywhere in the record

14   where anybody has contacted Barnes-Jewish Hospital for this

15   appointment.

16          So, we are here on the April 21st note.  So, you

17   don't see anything, right?

18   A.   I don't see anything there.

19   Q.   Next document is blank, next document is dated in March,

20   right, so that would be irrelevant, correct?

21   A.   Could you repeat that?

22   Q.   Well, this document predates the April 13th approval,

23   right?

24   A.   Yes.

25   Q.   Okay.  This next document is dated March 3rd, so that also

1    predates the April 13th approval, right?

2    A.  Yes.

3    Q.  This document is dated March 24th, and so that predates

4    the April 13th approval?

5    A.  Yes, it does.

6    Q.  This next document is dated March 24th, also predates the

7    approval, right?

8    A.  Yes.

9    Q.  Okay.  This document is also dated in March, correct?

10   A.  Yes.

11   Q.  Okay.  So, we are not going to learn anything there,

12   right?

13   A.  Right.

14   Q.  This is the April 13th approval we have been talking

15   about, so we will go past that.

16          And then the last thing is a *Mar*, so that's not going

17   to reflect any sort of approval or contact with BJC, right?

18   A.  Right.

19   Q.  So, the medical records show no contact with BJC to

20   actually contact on this approval, correct?

21   A.  Correct.

22   Q.  And you are saying that maybe there's some other record

23   somewhere that--

24   A.  No, I'm saying that it's not always in the record when a

25   contact is made.

1    Q.  So, if I'm sitting here today and I tap you on the

2    shoulder and I say, "Dr. Myers, would you know or would you

3    have any way of figuring out whether BJC has been contacted to

4    actually set up this appointment," would you have any way of

5    figuring that out?

6    A.  Yes.

7    Q.  Okay.  How would you do that?

8    A.  I would contact the office associate.

9    Q.  Okay.  Would the office associate -- Who is that person?

10   What's that person's name?

11   A.  Sharon Harvel.

12   Q.  And would she -- Is there any document that she would

13   refer to to figure out whether she contacted the BJC for

14   approval?

15   A.  Yes.

16   Q.  Okay.  What document is that?

17   A.  It would be her schedule.

18   Q.  But, sitting here today you don't know whether or not

19   she's done that, correct?

20   A.  Correct.

21   Q.  Okay.

22         MR. WEIL:  That's all I have for Dr. Myers.

23         THE COURT:  All right.  Well, Counsel, look.  Here's

24   -- First of all, Dr. Myers, before you go, how do you --

25   Sharon -- Can you spell her last name?

```
 1   A.  H-A-R-V-E-L.

 2           THE COURT:  H-A-R-V-E-L?  B, as in boy?

 3   A.  V, as in Victor.

 4           THE COURT:  V, as in Victor.  All right.

 5           Counsel, here's how I see this --

 6           And, Mr. Weil, if you could quit sharing your screen.

 7           MR. WEIL:  Oh, I'm sorry, yes.  I apologize.

 8           THE COURT:  I don't know what's going on here.  I

 9   understand the security concerns of letting Mr. Hunter know

10   when the appointment is scheduled, but it's been more than

11   three weeks since it was approved and surely, I'm going to

12   hope, that the call has been made and Dr. Myers just doesn't

13   know about it.  It seems like Ms. Harvel could be contacted to

14   find that out.

15           So, I think it would be the best use of our time if

16   Wexford can just report to me what the status is, if the --

17   you know, because we are kind of chasing our tail here while

18   it's been approved for a consult, but that hasn't been

19   scheduled, and then once that does finally happen the surgery

20   is going to have to be scheduled, and I don't see why this

21   would just keep getting pushed off, because no one seems to be

22   contesting that Mr. Hunter needs to be evaluated by a

23   colorectal surgeon.  So, I think the better use of our time

24   would be Counsel can report to me and at least give me a time

25   frame of when the call was made, when the appointment was
```

1    scheduled, and how long it is expected that it would take to

2    schedule surgery.

3           I mean, I know some surgeries are scheduled right

4    away, some you might have to wait to get on the surgeon's

5    schedule.  So, I think before we go any further, you know, it

6    seems like things are happening, but we are just kind of

7    spinning our wheels on what that is.  So, and then we can

8    convene again in a couple of weeks and see where we are, if I

9    feel like more testimony is needed or if I am told that the

10   consult has been scheduled and that -- you know, and then told

11   that surgery has been scheduled, it seems like the Plaintiff's

12   motion is moot.  So, I think that would be the best way.

13          I will ask Counsel to submit those records that we

14   reviewed today, the ones that were just recently produced,

15   submit those to me and, you know, I can -- I think we have

16   pretty well reviewed them today, but I would like to have

17   them.

18          Mr. Weil, any objection to what I have proposed or

19   any other thoughts of how we should proceed, to use our time

20   wisely?

21          MR. WEIL:  Not at all, Judge.  I think that's the

22   right course.  As you can tell and infer from what you just

23   laid out is just this concern of things are approved, but then

24   nothing happens or it doesn't seem to happen, at least.

25          The only suggestion I would make is that we don't

1    really need a couple of weeks to figure out where we stand.

2    You know, I think that some sort of status update by Counsel

3    for the IDOC or for Wexford or both would just sort of let us

4    know -- by the end of this week would let us know where we

5    stand and then we can move forward.

6         You know, as long as the time for the appointment

7    isn't, you know, months out, I don't think we have any concern

8    in terms of needing to know the exact time Mr. Hunter is to be

9    sent out.  But, given the amount of time, it doesn't seem that

10   it would be very hard for Counsel to say when this call was

11   made, whether an appointment is set up and a rough time frame

12   for when the appointment will actually occur.

13        THE COURT:  Okay.  Well, I agree.  And, I guess by

14   *status*, I think that that can be provided pretty quickly and I

15   would like a joint report from IDOC and Wexford as to, again,

16   whether the call has been made, whether the appointment has

17   been scheduled, a time frame for when that's going to occur,

18   and then hopefully down the road an update on surgery.

19        Ms. Fritz, any reason why you couldn't get me that

20   information, say, by this coming Monday?

21        MS. FRITZ:  Your Honor, a couple things.  One, I

22   don't think we have a problem getting the estimation.  It is

23   my understanding it is scheduled, so I don't think that's a

24   problem whatsoever.  However, I will -- if you permit me, I

25   will say that I think the situation is already moot, Your

1    Honor.  The medical records we reviewed today show that he has

2    received a consultation for -- by a colorectal specialist at

3    SIH.  Those are produced in our joint response in opposition,

4    as well as briefly shown today that that was exactly what

5    Plaintiff's counsel was requesting in their motion.  They

6    wanted a referral for a consultation.  They did not request

7    surgery.  That was not a part of their current motion.  As a

8    result, the issue is already moot, because he was seen by a

9    colorectal specialist.  The fact that he was seen for a second

10   appointment and is, again, based on my understanding, is

11   scheduled to be seen within the next couple of weeks or less,

12   but I want to confirm the exact date, that's even beyond what

13   they requested in their motion.  So, while we are more than

14   happy to provide that documentation to see where it stands, I

15   think the issue is already moot.

16        THE COURT:  Okay.  Well, I don't have anything other

17   than you telling me that it has, in fact, been scheduled

18   within the next few weeks, because Dr. Myers didn't have that

19   information.  So, get me that information by close of business

20   on Monday and I will evaluate at that point whether or not the

21   motion is moot.  If it's moot -- Because I do know that that

22   was the injunctive relief requested, was referral for a

23   surgical consultation.  So, although he was seen by someone,

24   then that person recommended the surgeon, so I want to make

25   sure that that is, in fact, happening as you tell me it is.

```
 1    The motion might be moot and, of course, if something else

 2    comes up it could be refiled.  But, get me that information by

 3    Monday.

 4           MS. FRITZ:  Yes, Your Honor.

 5           THE COURT:  And, Ms. McClimans, just to the extent

 6    you can contribute anything, join in with Wexford to let me

 7    know what's going on.

 8           MS. McCLIMANS:  And, I did verify that the surgery is

 9    scheduled during this hearing and --

10           THE COURT:  So, the surgery is scheduled or the

11    consult is scheduled?

12           MS. McCLIMANS:  I can verify that there is a date

13    coming out that he is going out.

14           THE COURT:  Okay.  Well, let me know, because all we

15    have been talking about is getting an appointment for the

16    consult, and it's my understanding that that would have to

17    happen before the surgery.

18           MS. McCLIMANS:  Right.

19           THE COURT:  So, if it's scheduled, then great, but I

20    feel like we are just chasing our tail here.

21           MS. McCLIMANS:  Yes, we can verify everything this

22    morning and send something to Counsel.

23           THE COURT:  Okay.  All right.

24           Mr. Weil, anything else at this time?

25           MR. WEIL:  Nothing from us, Judge.  Thank you.
```

```
 1              THE COURT:  All right.  Ms. Fritz, anything else?

 2              MS. FRITZ:  No, Your Honor.  Thank you.

 3              THE COURT:  Ms. McClimans?

 4              MS. McCLIMANS:  No, Your Honor.

 5              THE COURT:  All right.  I will look forward to

 6   getting that information, and I will decide at that point

 7   where we go from here.

 8              All right.  Thank you, Dr. Myers.  And, have a good

 9   day, everybody.

10              (Proceedings adjourned)

11

12

13

14                    REPORTER'S CERTIFICATE

15                 *  *  *  *  *  *  *

16    I, Stephanie K. Rennegarbe, RDR, CRC, Official Court

17   Reporter for the U.S. District Court, Southern District of

18   Illinois, do hereby certify that I reported with mechanical

19   stenography the proceedings contained in pages 1-33; and that

20   the same is a full, true, correct and complete transcript from

21   the record of proceedings in the above-entitled matter.

22

23   /S/ Stephanie K. Rennegarbe,            09/07/2022
     IL CSR, RDR, CRC
24

25
```