# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ILLINOIS

Antonio Hunter,

                          Plaintiff,

v.

Illinois Department of Corrections *et al.*,

                          Defendants.

Case No.  21-cv-271-NJR

JURY TRIAL DEMANDED

## **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]**

---

[1] Plaintiff has leave to file a combined response to the two motions for summary judgment in this case. Dkt. 101. Because the Plaintiff is responded to two briefs, he has interpreted the local rules to be that he can have 20 pages for each response, so 40 combined. If Plaintiff is mistaken, he will refile.

## INTRODUCTION

During his detention at Pinckneyville Correctional Center from January 2018 to July 2022, Plaintiff Antonio Hunter needed medical treatment for a severe, painful, and worsening rectal prolapse. Rectal prolapse means that his rectum—the last portion of his large intestine—regularly fell out of his anus. Left untreated, every day it leaked feces and sometimes blood. Mr. Hunter had to reach down and push his rectum back into his anus with his hands. To defecate, Mr. Hunter had to reach into his anus and manipulate his rectum with his fingers until he moved it into such a position that his bowels released.

For four years, his untreated rectal prolapse sprayed feces, mucus, and blood on himself and his cell. It was so unsanitary that Pinckneyville doctors ordered that he be placed in a cell by himself because his defecations posed a health hazard to any prisoner sharing a space with him. The rectal prolapse was painful, dangerous, and tremendously humiliating. It inhibited him from walking around the prison facility and participating in activities like exercise, chapel, going to the dining hall or law library, or simply passing time with other people. He instead had to spend that time in his feces-covered cell where he could be near his toilet, sometimes defecating up to eight times a day. And Defendants denied him wipes or any cleaning supplies to help manage his condition and sanitation for almost four years.

In Spring 2018 both a physician at Pinckneyville and the Pinckneyville Medical Director determined that Mr. Hunter needed a surgical consultation with a specialist for his rectal prolapse. Yet the Defendants failed to treat Mr. Hunter's condition, including by denying him the surgical consult. Defendants insisted that before approving Mr. Hunter's surgery, they needed to review records from a rectal prolapse surgery he had in 2012. But those records were provided more than four years ago, and Defendants did not review them to determine whether surgery was appropriate or take any action once those records were obtained. There is no evidence that

2

Defendants had a plan for what to do with the medical records, or what to do if they were unavailable. Defendants did not intend on treating Mr. Hunter, regardless of whether they ultimately received his records and no matter what the records said. Similarly, Defendants said that blood had to be drawn before the consult could happen, but blood was drawn six months after the request was made. Nothing was done based on that draw.

Defendants have moved for summary judgment, Dkt. 97, 104, claiming that the undisputed factual record shows Plaintiff cannot make out viable Eighth Amendment, American with Disabilities Act ("ADA"), or Rehabilitation Act claims. Their motion lacks merit. Their purported statements of undisputed material facts omit key factual issues in dispute, and wholly fails to construe the record in Plaintiff's favor. Simply put, this case poses material disputed questions of fact, and a jury trial is required to resolve them.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

**Mr. Hunter's Rectal Prolapse Condition**

1.      Plaintiff Antonio Hunter has a condition called rectal prolapse, meaning that the last portion of his large intestine – his rectum – protrudes outside of his anus. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.**)** at 141:18-23.

2.      Rectal prolapse "can be problematic in terms of pain and keeping areas clean." Ex. 4 (Meeks Dep.) at 48:3-4; Ex. 2 (Hunter Dep. Vol. 2) at 26:20-28:7.

3.      Mr. Hunter has to move the rectal prolapse with his hands in order to evacuate his bowels. Ex. 2 (Hunter Dep. Vol. 2) at 27:5-28:7. This method of evacuation is hard to control, so Mr. Hunter's fecal matter regularly sprays onto the wall, floor, toilet, and nearby sink. Ex. 2 (Hunter Dep. Vol. 2) at 27:5-28:7. Sometimes he has to use the bathroom eight or more times a day. Ex. 2 (Hunter Dep. Vol. 2) at 27:2-28:1.

3

4.      Rectal prolapse puts an inmate at risk of infection due to the handling of fecal matter, which contains bacteria, and the exposure of the rectal tissue outside the body, which can increase the chances of contamination and bacterial growth. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 77:11-15; Ex. 4 (Meeks Dep.) at 49:5-12.

5.      A rectal prolapse also presents a risk of rectal incarceration, which occurs when the prolapsed rectum becomes trapped and unable to return to its normal position. Rectal incarceration can cause necrosis, compromised blood flow, infection, and death. Ex. 4 (Meeks Dep.) at 48:5-49:4; Dkt. 52-1 and Ex. 33 (Letter from Dr. Shapiro).

**Mr. Hunter's Efforts To Get Treatment For His Rectal Prolapse**

6.      Plaintiff Antonio Hunter was incarcerated at the Illinois Department of Corrections (IDOC) starting on November 6, 2017. Ex. 9 (NRC Problem List).

7.      IDOC had a contract with Wexford for the latter to provide medical and healthcare services to inmates. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 17:13-18.

8.      Mr. Hunter began his incarceration at IDOC's Northern Reception Center. A doctor at the NRC recorded Mr. Hunter's rectal prolapse as a "problem" for Mr. Hunter. Ex. 9 (NRC Problem List).

9.      Plaintiff was transferred to Pinckneyville Correction Center in January 2018. Ex. 11 (January 16, 2018 Progress Notes).

10.      Since 2009, Wexford has been the only medical provider at the Pinckneyville Correctional Center. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 21:8-9.

11.      Wexford follows IDOC's administrative directives and Pinckneyville's institutional directives in providing medical care at the facility. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 28:12-29:16.

12.     At Pinckneyville Correctional Center, IDOC employee Christine Brown is the Healthcare Unit Administrator and the ADA Coordinator. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 17:11-18. As the Healthcare Unit Administrator, she oversees the contract between IDOC and Wexford at Pinckneyville to ensure that Wexford was following its contract and to report any instances when it was not. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 17:13-18, 21:10-21. In this role she could ask the doctor at Pinckneyville, Dr. Percy Myers, to see a particular patient or to look at a particular issue, but she could not tell him how to approach a particular medical issue. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 23:21-25:21.

13.     Ms. Brown is responsible for grievances related to medical, disability, and ADA issues. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 128:19-21, 142:42-143:16. She gave input to the warden's office about adjudicating grievances. Ex. 4 (Meeks Dep.) at 31:14-17.

14.     When an inmate is transferred to Pinckneyville, the medical staff review the problem list for chronic conditions, debilitating conditions, and other ongoing medical issues and problems. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 57:10-20, 60:4-6.

15.     Upon his entry, Pinckneyville medical staff again identified Mr. Hunter's rectal prolapse as a problem, and in light of the prolapse, Mr. Hunter was granted a lower bunk permit. *See* Ex. 9 (NRC Problem list); Ex. 10 (Low Bunk Permit); Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 61:12-19.

16.     Mr. Hunter needed the low bunk because the rectal prolapse caused him to have difficulty climbing to the upper bunk and he would sometimes have a bowel movement while climbing. Ex. 11 (January 16, 2018 Progress Notes); Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 73:22-24.

17.     Mr. Hunter was reporting that he had a rectal prolapse. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 63:16-24.

18.     On February 27, 2018, Mr. Hunter wrote a grievance that he had been seen by a nurse on January 14, 2018, and he explained his rectal prolapse issue. Ex. 24 (Grievances) at 1. He told the nurse that his prolapse would not stop popping out, that he had a stomachache, had to use his hands to defecate, and needed a single cell due to bleeding and messing on himself. Ex. 24 (Grievances) at 1. He marked that his grievance was related to "staff conduct," "medical treatment," and "disability," and the "ADA." *Id.*

19.     IDOC, including the HCUA and the Agency Medical Director, could have raised issues identified in the grievance process through appeals or even by joining utilization management calls. Ex. 6 (Ritz Dep.) at 62:5-18. Wexford would get involved in the grievance process if the Agency Medical Director identified a problem related to a grievance and had questions for them. Ex. 6 (Ritz Dep.) at 61:22-62:2.

20.     On March 17, 2018, Ms. Brown – IDOC's ADA Coordinator – wrote a memo in response to Mr. Hunter's grievance stating that he had been seen by the doctor on January 12, 2018 and he had not raised issues with his "repaired prolapse." Ex. 25 (March 27, 2018 Memo). She also wrote that he had been given a low bunk permit in January and that he had not mentioned rectal bleeding at a March 19, 2018 hypertension clinic appointment. Ex. 25 (March 27, 2018 Memo). She added, "the file reports his prolapse was already repaired." *Id.*

21.     On April 19, 2018, Mr. Hunter went to the healthcare center for rectal pain and discomfort related to his rectal prolapse. Ex. 12 (April 19, 2018 Progress Notes); Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 81:8-82:17. He reported 10 out of 10 pain when using the bathroom and that the pain had continued from November 17 to the current date of April 19,

2018. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 81:8-82:17; Ex. 12 (April 19, 2018

Progress Notes). He explained that he had difficulty moving his bowels and had rectal bleeding.

Ex. 12 (April 19, 2018 Progress Notes); Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at

83:12-15.

22.     When a patient reports having pain, a medical provider assumes that they are. Ex.

4 (Meeks Dep.) at 49:22-50:3.

23.     The nurse referred him to a doctor because he was presenting with signs of

"acute, severe discomfort" and prescribed him pain medication. Ex. 5 (Brown IDOC Rule

30(b)(6) Designee Dep.) at 85:9-22; Ex. 12 (April 19, 2018 Progress Notes).

24.     Mr. Hunter finally saw a prison physician on April 28, 2018. 13 (April 28, 2018

progress notes). He reported to the physician, Dr. Percy Myers, that he had extensive bleeding,

no bowel movements, and that the Stateville doctor had recommended that he have surgery. Ex.

13 (April 28, 2018 progress notes); Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 88:10-

89:9. Dr. Myers noted that as soon as he started examining Mr. Hunter, a bowel movement

started coming out of Mr. Hunter's rectum. Ex. 13 (April 28, 2018 progress notes). Based on this

evaluation, Dr. Myers ordered Mr. Hunter to be moved to a single cell due to the concern that

fecal incontinence and leaking of stool could put a cellmate at risk. Ex. 3 (Babich Wexford Rule

30(b)(6) Designee Dep.) at 44:19-23; Ex. 13 (April 28, 2018 Progress Notes).

25.     Dr. Myers also recommended that Mr. Hunter have a surgical consultation. Ex. 13

(April 28, 2018 Progress Notes); Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 94:4-5.

Dr. Myers would not have made a referral for a surgical consult based on just a bowel

movement. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 129:20-130:2.

26.     After this exam, Dr. Myers completed a "Medical Special Services Referral and Report" form the same day in order to refer Mr. Hunter to a surgeon for a surgical consult and "surgical evaluation for correction" since his rectal prolapse symptoms had returned in late 2017 since his 2012 surgery with extensive bleeding. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 96:13-15, 96:20-25. Ex. 15 (Medical Special Services Referral and Report). He marked the request "urgent," meaning that Mr. Hunter should see the colorectal specialist within 30 days or less. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 170:3-5.

27.     The site medical director agreed with Dr. Myers that a surgical referral should be done, and he approved Dr. Myers's request. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 159:22-25.

28.     The surgical consultation would have addressed the issue of fecal seepage and rectal bleeding because the colorectal surgeon would have been able to evaluate why the seepage was happening and would have ordered a colonoscopy to check for anal bleeding. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 131:20-132:12. The referral would have also addressed evaluating Mr. Hunter for infectious diseases. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 136:25-137:3.

29.     After the request was approved by a second physician at the site level, it went up to utilization management at the corporate level to determine whether the patient would be sent for offsite care. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 160:1-8; Ex. 6 (Ritz Dep.) at 12:24-13:1.

30.     At the time, Dr. Stephen Ritz was the Corporate Medical Director for Utilization Management for Wexford. Ex. 6 (Ritz Dep.) at 12:24-13:1. Utilization management, through its

8

collegial review process, determined whether an inmate was sent to an outside provider. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 60:10-17.

31.     On May 3, 2018, Dr. Ritz and Dr. Butalid discussed Mr. Hunter's referral in the collegial review process and noted, "Past records have not been obtained." They "agreed to ATP to re-present with past records." Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 172:13-16; Ex. 34 (Wexford Utilization Management Log).

32.     Dr. Ritz could have set a time frame for the completion of these tasks, but he did not. Ex. 6 (Ritz Dep.) at 50:8-22. Wexford's general practice, when they did not consider a condition to be a medical emergency and it had been previously diagnosed or treated was to "try to get records to evaluate that to get as much objective information as we can." See Ex. 6 (Ritz Dep.) at 33:1-7.

33.     The middle section of the Medical Special Services Referral and Report would usually be the section where the outside provider would write his or her notes. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 153:8-154:11.

34.     Here, in the middle section of the Medical Special Services Referral and Report", Dr. Butalid wrote: "Denied surgical evaluation at this time. Get all medical / surgical records. CBC, PT, PTT." Ex. 15 (Medical Special Services Referral and Report).

35.     The same day, Dr. Butalid wrote a progress note stating, "collegial review related to rectal prolapse, denied surgical evaluation." Ex. 26 (May 5, 2018 Progress Notes); Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 109:16-20. He wrote that the plans were to: 1) get old medical records; 2) CBD, PT, PTT; and 3) no need for single cell at this time. Ex. 26 (May 5, 2018 Progress Notes); Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 109:16-20.

36.    The CBC, PT, and PTT tests were supposedly ordered to check for excessive bleeding or clotting issues related to Mr. Hunter's reports that he was having excessive bleeding and to help evaluate whether Mr. Hunter was losing more blood than he said or needed treatment sooner. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 99:16-22; 104:12-16.

37.    While Dr. Ritz and Wexford knew that IDOC required the use of the word "denied" when the consult was not granted, internally, they prefer to use the term "alternative treatment plan" or ATP. Ex. 6 (Ritz Dep.) at 30:11-22; 32:2-9. Despite this internal label, Wexford knew that Mr. Hunter would understand that his request was denied, and the ATP constituted a denial.  Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 217:22-218:4.

38.    When an alternative treatment plan is created, the patient is usually seen within about a week to review the alternative treatment plan. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 169:7-12. While there is no requirement or policy to do so, the medical provider will often discuss the new treatment plan and the plan going forward with the patient and to reevaluate the patient. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.)) at 80:10-22.

39.    The patient is not given a copy of the alternative treatment plan. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 103:11-13.

40.    A few days after this collegial review, Mr. Hunter signed a permission form for the provision of the records Wexford demanded. Ex. 23 (Medical Records Transfer Authorization).

41.    Other than signing the authorization form, an inmate is not responsible for getting his or her own prior medical records. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) 103:5-7.

42.    Once the issue was referred to collegial review, the site medical director took over the issue and the ATP, and Dr. Myers was no longer involved unless the site medical director

handed it back to him. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 212:5-10; Ex. 24 (Grievances).

43.     If a medical provider disagreed with the utilization management decision, Dr. Ritz and Wexford encouraged the provider to appeal the issue through Wexford's internal review process rather than taking the alternative option, raising the issue directly to Dr. Meeks who had ultimate authority over the care provided to inmates. Ex. 6 (Ritz Dep.) at 37:12-21.

44.     At a May 4, 2018 Mental Health Evaluation visit, Mr. Hunter stated, "I got a serious medical problem and it is stressing me out too much. I have a rectal prolapse. I am waiting to see the surgeon." Ex. 16 (May 4, 2018 Mental Health Evaluation) at 1.

45.     On May 8, 2018, Mr. Hunter signed a medical record authorization form to have his records released to Pinckneyville. Ex. 23 (Medical Records Transfer Authorization).

46.     Medical records could be obtained through the Healthcare Unit Administrator or the Medical Records team. Ex. 4 (Meeks Dep.) at 76:14-19. Indeed there were processes and procedures for Wexford, Dr. Ritz, and the collegial review staff to get prior medical records from the facilities and/or outside providers if needed. Ex. 4 (Meeks Dep.) at 45:2-8.

47.     The alternative treatment plan was not discussed with Mr. Hunter. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) 103:14-16; Ex. 1 (Hunter Dep. Vol. 1) at 85:10-18.

48.     Usually when CBC, PT, and PTT tests are requested the order is put on the schedule and the tests would be done within a few weeks. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 157:10-14; see Ex. 6 (Ritz Dep.) at 33. The progress notes would reflect when the labs were drawn. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 112:23-113:7.

49.     Once the lab results are back, there is usually a follow-up appointment with the patient to review the results. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 168:13-15.

50.     The Wexford providers at Pinckneyville were responsible for getting the records of the past surgery. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 177:19-24.

51.     A June 28, 2018 note reflects that the Pinckneyville medical staff had received Mr. Hunter's 2012 medical records from the facility where Mr. Hunter had been incarcerated at the time of his 2012 surgery. Ex. 23 (Medical Records Transfer Authorization). Wexford's Rule 30(b)(6) designee also testified that the records were reviewed by Dr. Myers on July 19, 2018, but there was no indication in the progress notes about the file review or what happened afterwards. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 195:11-196:6.

52.     Without an appointment with a provider, Wexford did not have a method for monitoring the rectal prolapse problem while they waited for the prior medical records. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 69:14-70:12.

**Mr. Hunter Is Given A Single Cell Permit**

53.     If a doctor determined that an inmate had a disability, the doctor "would prescribe what he felt was medically necessary for the patient and what kind of accommodations might be needed." Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 95:4-7.

54.     The prison physician determined that single-celling was necessary due to Mr. Hunter's rectal prolapse, and authorized a "Physically Challenged (Handicapped) Request" on the basis that prolapse made Mr. Hunter's bowel movements so difficult to control that the bowel movements often caused feces and "associated blood" to "cover[]" his cell, which posed a health hazard to any cellmate. Ex. 14 (Physically Challenged (Handicapped) Request form).

55.     Both bottom bunk permits and single cell accommodations were not frequently granted. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 127:17-128:2.

56.     When Mr. Hunter was assigned to a single cell, the doctor did not treat the condition or provide Mr. Hunter with cleaning supplies, tissues, or anything to clean himself and maintain his hygiene. Ex. 2 (Hunter Dep Vol 2) at 9:10-22.

**Mr. Hunter's Continued Requests For Treatment Are Denied**

57.     On May 21, 2018, Mr. Hunter's counselor responded in writing to his February 27, 2018 grievance stating that it had not been filed within 60 days of the problem that had given rise to it. Ex. 24 (Grievances) at 1.

58.     On July 18, 2018, Mr. Hunter submitted another grievance, marking it as related to staff conduct, medical treatment, and disability. Ex. 24 (Grievances) at 2.

59.     He was writing another grievance to seek emergency medical treatment and to see a surgeon to fix the problem. Ex. 24 (Grievances) at 2. He explained that the doctor half-examined him on April 28, 2018 and jumped back when he saw the prolapse. *Id*. He was told he would see the surgeon. *Id.* Up to that point, he had only received a single cell and no medical treatment or supplies. Ex. 24 (Grievances) at 3. He explained that it was very hard for him to have bowel movements because he had to manipulate the tissue to release his bowels. *Id*. He reported that the rectal prolapse caused him stomachaches, pain, and stress, and that he had to walk around with tissue in his rectum because of the bleeding. *Id.*

60.     Unlike the February grievance, this grievance was marked for emergency review and expedition. *Id.*

61.     The grievance officer emailed ADA Coordinator Brown about this issue. Ex. 27 (July 31, 2018 Email). Ms. Brown responded that when Hunter was seen in April for rectal prolapse, the doctor "did not see a prolapse and reported the offender was having a BM at the time of the exam. The offender reported past surgery to repair but no old records from pervious

surgery has been found to date. Wexford denied surgery related to wanting old records and his lab results were all normal not indicating he was having severe rectal bleeding. The offender requested to be single cell and a low bunk which he was given. He has been seen in the HCU several times since this day with no mention of pain or rectal bleeding. If he is having issues he needs to go through NSC and be evaluated." Ex. 27 (July 31, 2018 Email).

62. Based on this information, the request was denied on August 1, 2018. Ex. 24 (Grievances) at 3.

63. On September 9, 2018, Mr. Hunter appealed this denial. *Id.*

64. In his appeal, Mr. Hunter explained that his prolapse continued to "pop out." Ex. 32 (September 5, 2018 letter). He explained that he was having the same problems as when he needed surgery in April 2012. *Id*. He had to lift the prolapse to release his bowels. *Id.* He said he continued to need to see a doctor who specialized in this issue. *Id.*

65. In denying his appeal, the administrative review board recognized that Mr. Hunter wanted surgery for his rectal prolapse as of January 2018. Ex. 31 (Grievance Board Response).

66. While the August 1, 2018 grievance response and Ms. Brown's July 31, 2018 email said that his lab results "were all normal" supposedly indicating that he was not having severe rectal bleeding, there is no documentation in Mr. Hunter's record that CBC, PT, or PTT labs were drawn any time between the date of the alternative treatment plan (May 3, 2018) and the date of this statement. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 148:20-149:9, 151:2-10.

67. Mr. Hunter's progress records and labs reflected that blood was not drawn for CBC, PT, or PTT labs in May, June, July, August, or September 2018. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 208:11-23; Ex. 28 (Hunter Lab Results). CBC labs were drawn on

14

October 2, 2018. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 208:21-209:5; Ex. 28 (Hunter Lab Results).

68.     Through October, 2018, there was no follow-up by Wexford on getting the medical records pursuant to the ATP. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 201:11-15.

69.     Mr. Hunter raised concerns about his rectal prolapse every time he went to his hypertension clinic. Ex. 1 (Hunter Dep. Vol. 1) 92:14-20.

70.     During a November 30, 2018, one-on-one mental health session, the counselor recorded that Mr. Hunter, "expresses frustration that the physician is not letting him see a surgeon. He reports having a rectal prolapse. He claims Dr. Myers told him Wexford would not approve it." Ex. 18 (November 30, 2018 Mental Health Progress Notes).

71.     In a February 8, 2019, psychiatric appointment, Mr. Hunter reported, "I'm frustrated because I have gotten no help for my rectal prolapse." Ex. 19 (February 8, 2019 Psychiatric Progress Notes).

72.     Mental health services are also provided by Wexford, often in the Healthcare Center, though not always. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 40:5-7, 41:11-15, 154:2-7. Wexford nurses worked in both medical and mental health. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 172:20-173:18; 175:4-10.

73.     Mental health personnel can make a referral to the medical personnel if an issue needs to be addressed. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 199:10-12.

74.     Psychiatric and mental health records are part of a patient's medical records. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 154:2-7.

75.     In May 2019, Mr. Hunter underwent emergency surgery for a spinal condition. In preparing for surgery, the outside doctors examined Mr. Hunter's rectum, observed that he had a rectal prolapse, and confirmed that he had a rectal prolapse with "no rectal tone." Ex. 2 (2019 surgical records) at 3; Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 216:23-217:1.

**Wexford Receives Mr. Hunter's Prior Medical Records**

76.     On June 7, 2019, Mr. Hunter's counsel wrote to Wexford, Dr. Meeks, and Joe Ebbitt, Wexford's Director of Risk Management, who is a paralegal by training. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 8:11-13; 9:2-7; Ex. 29 (June 7, 2019 Letter with 2012 Medical Records).

77.     The letter stated that Mr. Hunter's 2012 rectal prolapse surgery was done at Cook County Hospital and it had those records attached to it. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 20:5-16; Ex. 29 (June 7, 2019 Letter with 2012 Medical Records). The letter asked Defendants to notify counsel if they needed any other documents. Ex. 29 (June 7, 2019 Letter with 2012 Medical Records).

78.     The letter also explained that Mr. Hunter was continuing to have severe rectal pain and discomfort, he had to use his hands to defecate, and he had inadequate sanitation supplies for that process. Ex. 29 (June 7, 2019 Letter with 2012 Medical Records).

79.     Mr. Ebbitt and Dr. Ritz received this letter sometime in early June, 2019. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 13:10-13.

80.     Further, IDOC administrative and operational leadership received information about the June 7, 2019 letter via emails with Dr. Ritz and Wexford's counsel and risk management division. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 31:8-16. Dr. Ritz understood that Dr. Tom Lehman, Wexford's Chief Medical Officer, alluded that he would take

16

care of the issue from at least a legal perspective and perhaps a legal and medical perspective. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 42:3-43:3. There is no evidence that Dr. Lehman took any steps to address the letter from a medical perspective and Dr. Ritz did not follow-up with him or any other personal to see what he did. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 42:3-43:3; 43:15-19; 46:20-47:23; 54:6-55:9.

81.     Even though Dr. Ritz and Dr. Butalid had agreed to re-present Mr. Hunter's surgical consult request when the prior medical records were obtained. Dr. Ritz did not let Dr. Butalid or Dr. Myers know that he had the records. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 172:13-16. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.)) at 43:4-11.

82.     Nothing was done with the medical records from the 2012 rectal prolapse surgery. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 18:14-20:16. Dr. Ritz and Wexford did not inform Pinckneyville staff about the letter or the attached records. *See* Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 26:2-6. They did not tell anyone at Pinckneyville that Mr. Hunter's prior rectal surgery took place at Cook County hospital or otherwise make sure that this information was used to obtain the 2012 surgery records. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 22:19-23:2; 27:18-28:6; 53:13-22; 54:6-55:9.

83.     The alternative treatment plan was not revisited after these 2012 surgery records were obtained by Dr. Ritz and Wexford. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 26:7-11. Neither Dr. Ritz nor anyone else re-raised Mr. Hunter's request at collegial review now that the 2012 records had been pertained as requested in the May 3, 2018 ATP. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 27:24-28:12.

84.     Wexford did not follow up or take any action related to any medical issues related to the June 7, 2019, letter. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 29:4-21; 33:19-24; 34:9-22; 41:14-16; 44:22-45:10; 46:24-47:3; 50:12-18.

85.     Wexford addressed legal issues raised in the letter and they considered the letter to be intertwined with previous litigation brough by Mr. Hunter related to his rectal prolapse. Ex. 7 (Ritz Wexford Rule 30(b)(6) Designee Dep.) at 40:24-41:3. The complaint in that previous litigation stated that Mr. Hunter's 2012 rectal prolapse surgery took place at Cook County Hospital. *Hunter v. Sood*, Case No. 1:13-CV-02569, Dkt. No. 1 at ¶29.

**Mr. Hunter Is Still Unable To Get Care**

86.     Indeed, during a December 3, 2019, mental health session, Mr. Hunter reported that Wexford was "still refusing me medical [treatment]. I saw Dr. Myers he said he didn't see it. I had surgery on it before in 2012. It's all in my medical file." Ex. 17 (December 3, 2019 Mental Health Progress Notes).

87.     Mr. Hunter filed a civil complaint asking for injunctive relief on March 10, 2021. Dkt. No. 1.

88.     Dr. Ritz believes, "Inmates, as a class of people, are generally very litigious," so he did not usually make note of any particular case, even if injunctive relief is requested. Ex. 6 (Ritz Dep.) at 64:10-18. Generally pending litigation does not change Dr. Ritz's or Wexford's decisions on utilization management. Ex. 6 (Ritz Dep.) at 74:10-17. "Nothing short of a court order is going to alter our medical decision-making and recommendation process beyond medical necessity and clinical appropriateness." Ex. 6 (Ritz Dep.) at 74:21:24.

89.     In 2018 and 2019, there was no way for an inmate to raise a medical complaint or a medical concern to utilization management. Ex. 6 (Ritz Dep.) at 74:25-75:4.

90.     After Mr. Hunter's grievance had been denied at all three levels, he had exhausted his remedies at Pinckneyville for getting a surgical consult for a condition that was continuing to cause him pain and discomfort. EX. 1 (Hunter Dep. Vol.1) 86:5-20.

**Mr. Hunter's Activities Are Limited By His Constant Anal Seepage And Rectal Pain**

91.     During his incarceration at Pinckneyville, Defendants never provided Plaintiff with sanitary pads, diapers, wipes, cleaning supplies apart from the soap he bought or other sanitary materials, despite the fact that he continued to have constant anal seepage. Ex. 2 (Hunter Dep. Vol. 2) at 26:24-19.

92.     Someone with constant anal seepage may not be able to leave their cell if they were not provided with diapers. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) 196:7-12. If an inmate is in so much pain or discomfort that they do not want to leave their cell, they did not have to. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 196:18-22.

93.     When inmates go to the dining hall, the law library, or a job, they need to be given permission each time they need to go to bathroom. Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 137:3-15.

94.     Plaintiff's anal leaking and seepage became severe and constant in the summer of 2018. Ex. 1 (Hunter Dep. Vol.1) 27:14-24.

95.     Plaintiff asked for sanitary materials to contend with the anal leakage that inhibited his movement, but these requests were denied. Ex. 2 (Hunter Dep. Vol. 2) at 26:24-27:1; 27:16-19; 9:19-10:1. He asked to be able to use the bathroom outside of the schedule for activities like the law library and school and he was denied those requests. Ex. 2 (Hunter Dep. Vol. 2) at 26:7-12. These denials of access to the bathroom caused him to leak fecal matter on

himself, and it would also cause him pain if he was denied access to the bathroom because he would have to try and hold his rectum inside of his body. Ex. 2 (Hunter Dep. Vol. 2) at 26:13-23.

96.     He was not able to go to gym or yard when he was having anal leaking. Ex. 1 (Hunter Vol. 1) at 26:20-27:20. When he did attend, he would stuff tissues in his rectum and stay by the port-o-potties. Ex. 1 (Hunter Dep. Vol. 1) at 29:13-30:6.

97.     Mr. Hunter's rectal prolapse stopped him from receiving medical care as exemplified by when Dr. Myers saw Mr. Hunter's protruded rectal prolapse, he misidentified it as a bowel movement and stopped the exam that he had been attempting. Ex. 24 (Grievances) at 3; Ex. 27 (July 13, 2018 Email); Ex. 13 (April 28, 2018 Progress Notes).

98.     He was also unable to attend chapel services, other activities held by the prison, and law library sessions. Ex. 2 (Hunter Dep. Vol. 2) at 23:25-24:12; 8:20-9:5-10:1.

99.     Mr. Hunter would have also liked to be able to play sports like basketball but he was unable to because of his anal seepage and anal pain. Ex. 1 (Hunter Dep. Vol. 1) at 31:15-19.

100.    He was unable to take any job – like those in the yard or the grounds – that would require him to ask for permission when he needed to use the washroom. Ex. 2 (Hunter Dep. Vol. 2) at 31:16-23.

**Mr. Hunter Moves For Preliminary Injunction To Get a Surgical Consultation**

101.    On February 25, 2022, Mr. Hunter filed a motion for preliminary injunctive to have a surgical consultation for his rectal prolapse. Dkt. No. 52.

102.    As part of this motion, Mr. Hunter submitted a letter from gastroenterologist and hepatologist specialist, Northwestern University Professor Dr. David Shapiro, who warned that leaving Mr. Hunter's condition without a surgical consultation could increases the risk of

infection and lead to even more severe symptoms like rectal incarceration – a medical emergency in which the rectum becomes stuck outside the body. Ex. 33 (Letter from David Shapiro).

103.    Dr. Shapiro reviewed Mr. Hunter's file and determined that Mr. Hunter had all of the primary physical indications that surgical consultation is necessary: "presence of a 'mass' coming from the anus, as well as difficulty with the defecation process and fecal incontinence." *Id.* Dr. Shapiro has stated that the standard of care in the treatment of rectal prolapse is surgery, and a surgical consultation is required. *Id*. In his opinion, Mr. Hunter was being denied the standard of care by not being provided with a surgical consultation. *Id.*

104.    After this request was filed, Mr. Hunter was seen by Dr. Myers on March 1, 2022. *See* Ex. 22 (March 1, 2022 Progress Notes). Dr. Myers noted that Mr. Hunter has continued to have symptoms including rectal bleeding and needing to manipulate his bowels to have a bowel movement. *Id*. Dr. Myers diagnosed Mr. Hunter as having "large hemorrhoids." *Id.*.

105.    The first time that Mr. Hunter was prescribed a package of wipes to help clean and handle his rectal prolapse during his time at Pinckneyville was at this appointment on March 1, 2022. Ex. 3 (Babich Wexford Rule 30(b)(6) Designee Dep.) at 215:25-216:3; 222:24-223:4; Ex. 22 (March 1, 2022 Progress Notes).

106.    Dr. Myers submitted an urgent Medical Special Services Referral and Report for Hunter to be evaluated by a colorectal surgeon for: "Very large hemorrhoids. Will need urgent evaluation. He reports bleeding on defecation and difficulty with defecation."  Ex. 20 (March 24, 2022 SIH Medical Group Colorectal Surgery Records) at 000688.

107.    Mr. Hunter was seen by a colorectal specialist on March 24, 2022, and she found that he, did not have hemorrhoids but, a "[r]ectal prolapse w/o anal sphincter tone. Anal seepage

and drainage – constant." Ex. 20 (March 24, 2022 SIH Medical Group Colorectal Surgery

Records) at 000688; Ex. 5 (Brown IDOC Rule 30(b)(6) Designee Dep.) at 197:16-22.

108.    She recommended a "[r]eferral to St. Louis BJC for Colorectal Surgeon consult

for surgical repair of recurrent rectal prolapse." Ex. 20 (March 24, 2022 SIH Medical Group

Colorectal Surgery Records) at 000691.

109.    On May 12, 2022, Mr. Hunter saw the BJC colorectal surgeon in St. Louis found

that Mr. Hunter had a "full-thickness rectal prolapse." Ex. 21 (BJC Colorectal Surgeon Referral

Form). He recommended that Mr. Hunter have: 1) a colonoscopy and 2) surgical repair after

prior op notes received. Ex. 21 (BJC Colorectal Surgeon Referral Form).

110.    On July 8, 2022, Mr. Hunter was released early from Pinckneyville without

corrective rectal prolapse surgery. Ex. 1 (Hunter Dep. Vol. 1) at 9:16-18.

## LEGAL STANDARD

At summary judgment, the moving party must establish that the case presents no genuine

issues of material fact which require a trial to resolve. *Ponsett v. GE Pension Plan*, 614 F.3d 684,

691 (7th Cir. 2010). When deciding whether a genuine dispute of fact exists, the Court must

view the facts in the light most favorable to Plaintiff, resolving all evidentiary conflicts in his

favor. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015); *Williams v. City of Chicago*, 733 F.3d

749, 752 (7th Cir. 2013) (credibility issues must be given to a jury to decide); *Hansen v.

Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (plaintiff is entitled to every

reasonable inference); *see also Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014) ("Deciding

which inference to draw from [a] conversation is the task of a fact finder."). Circumstantial

evidence is entitled to equal weight, especially in cases like this one that "turn on circumstantial

evidence, often originating in a doctor's failure to conform to basic standards of care." *Petties v.

Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

22

**ARGUMENT**

Plaintiff has presented evidence to support legal claims that Defendants Dr. Stephen Ritz, Dr. Steve Meeks and Wexford Health Sources, Inc. were deliberately indifferent to his rectal prolapse condition and that IDOC violated his ADA right by denying him access to programs, social opportunities, a clean cell, and other services because of his disability.[2]

**I.       A Jury Must Resolve Plaintiff's Constitutional Claims**

In order to succeed on his deliberate indifference claims, Plaintiff must prove that he suffered from an objectively serious medical condition, and that Defendants acted with deliberate indifference in response to that condition. *Petties*, 836 F.3d at 728 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A "serious medical need" is one which doctors have acknowledged requires treatment. *Id.* at 979. "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Lewis v. McLean,* 864 F.3d 556, 563 (7th Cir. 2017) (citing *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir. 2010)). *Cf. Gomez v. Randle,* 680 F.3d 859, 865 (7th Cir. 2012) (severe pain from a wound that patient believes is infected is serious medical condition).

In this case, Defendants do not dispute that Plaintiff suffered a serious medical condition. *See generally* Dkt. 97, Dkt. 104. Nor could they. Indeed, a court within the Seventh Circuit has found that it is "inexplicabl[e]" to contend that rectal prolapse is not a serious medical condition. *Stewart v. Barr,* No. 05-C-293-C, 2006 WL 741105, at *7 (W.D. Wis. Mar. 17, 2006). In *Stewart*, when it was undisputed that the plaintiff suffered rectal bleeding and pain because of his prolapse and that the defendants had given him medication and special accommodations (a no

---

[2] Plaintiff is no longer pursuing a claim of injunctive relief or a claim of deliberate indifference against Defendant Jeffreys.

kneeling order) because of the pain his rectal prolapse caused him, "the contention that plaintiff's medical condition is not serious is beyond meritless." *Id*. Additionally, Defendants cannot raise any challenge to the objective seriousness of Plaintiff's injury for the first time in reply. *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived."); *Drew v. Ramos*, 2013 WL 5212343, at *9 (N.D. Ill. Sept. 17, 2013) (failure to raise issue in summary judgment motion waives the matter at the summary judgment stage). Defendants' motion thus centers solely on whether they acted with deliberate indifference to Plaintiff's serious medical need.

### A.   A Reasonable Jury Could Find That Defendants Were Deliberately Indifferent To Mr. Hunter

Deliberate indifference requires a factfinder to inquire into the Defendant's subjective state of mind, a topic particularly ill-suited for resolution at summary judgment. *Conley*, 796 F.3d at 747 ("[S]tate of mind is an 'inquiry that ordinarily cannot be concluded on summary judgment.'"). To establish deliberate indifference, a plaintiff must show that a defendant was aware of and disregarded a substantial risk of harm to the plaintiff. *Farmer*, 511 U.S. at 835; *Ortiz v. Webster*, 655 F.3d 731, 734 (7th Cir. 2011). Because prison officials "[r]arely if ever" admit that they acted with deliberate indifference, prisoners typically establish it through circumstantial evidence. *Petties*, 836 F.3d at 728.

The Seventh Circuit has identified multiple ways that a plaintiff can prove deliberate indifference through circumstantial evidence. First, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer,* 511 U.S. at 842). Second, an "inexplicable delay in treatment" which "exacerbate[s] the [plaintiff's] injury or unnecessarily prolong[s] [his] pain" warrants denial of summary judgment. *Petties*, 836 F.3d at 730-31; *see also Grieveson v.*

24

*Anderson*, 538 F.3d 763, 779-80 (7th Cir. 2008) (delay in providing care actionable under the Eighth Amendment if evidence permits inference that plaintiff endured "many more hours of needless suffering for no reason").

Third, a prisoner may also show deliberate indifference through evidence that "the defendant's chosen 'course of treatment' departs radically from 'accepted professional practice,'" providing an inference that "no exercise of professional judgment actually occurred." *Diggs v. Ghosh*, 850 F.3d 905, 909 (7th Cir. 2017). *Petties*, 836 F.3d at 729 (citing *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)). This method is especially relevant in cases where the risk is difficult for a layperson to understand. *Id.* When medical staff persist in a course of treatment they know is ineffective, choose an "easier and less efficacious treatment[,]" or refuse to take instructions from a specialist, an inference of deliberate indifference at summary judgment is appropriate. *Petties*, 836 F.3d at 729-30; *Arnett v. Webster*, 658 F.3d 742, 753-54 (7th Cir. 2011); *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Several of these situations outlined by the Seventh Circuit as indicative of deliberate indifference are present here for Defendants Ritz, Meeks, and Wexford.

### 1.    Dr. Ritz was deliberately indifferent to Hunter's rectal prolapse

Mr. Hunter has presented evidence that Dr. Ritz acted with the culpable state of mind necessary to show deliberate indifference, since "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). That standard is satisfied whenever prison officials "unreasonably delay a prisoner's treatment such that it prolongs his suffering," or "contin[ue] a treatment known to be ineffective." *Foster v. Ghosh*, 4 F. Supp. 3d 974, 979-80 (N.D. Ill. 2013); *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) ("denial of medical care" that results in pain and suffering does not serve

a penological purpose and violates the Eighth Amendment); *Gulley v. Ghosh*, 864 F. Supp. 2d 725, 729 (N.D. Ill. 2012) (stating "[o]bviously, the refusal to provide access to a doctor or the denial of necessary medical treatment constitutes deliberate indifference," in the context of failure to treat pain from sciatica); *Gil v. Reed*, 381 F.3d 649, 652 (7th Cir. 2004) (finding that there was a factual issue related to whether a prison doctor was deliberately indifferent to a prisoner's medical needs when he did not follow a specialist's recommendation for post-rectal-prolapse-surgery medication, allegedly prolonging the patient's pain, rectal bleeding, and difficulty with urination and defecation for ten days).

Here, Dr. Ritz delayed Mr. Hunter's surgical consultation for almost three years after it was recommended by two doctors at Pinckneyville, while Mr. Hunter remained in pain and discomfort and experiencing rectal bleeding and problems defecating. PSOF ¶¶ 1, 29, 37, 104. The Defendants' justifications for their refusal to move forward on these medical recommendations are flimsy at best and specious at worse: they wanted Mr. Hunter's 2012 surgery records, even though they received them in 2019 and continued to ignore them, and that they needed to draw blood labs. PSOF ¶¶ 31, 34, 37. However, contrary to Defendants' assertion of the facts, there is no evidence that the blood draws were even done as part of Mr. Hunter's rectal prolapse treatment. PSOF ¶¶ 36, 38, 66-67. A jury could reasonably look past these justifications to find that what Dr. Ritz and Wexford actually provided to Mr. Hunter was not an "alternative treatment plan" but simply no treatment. PSOF ¶¶ 34, 37. No one met with Mr. Hunter about the plan. PSOF ¶ 47 Dr. Ritz did not set a time frame, as he could have, to make sure the service would be followed up on. PSOF ¶ 31.

The evidence also shows that Wexford did not even draw the blood for the labs that they ordered until after the grievance was denied (in part because he was supposedly not losing

enough blood) and six months total after they were requested. PSOF ¶¶ 67, 66. This undercuts the Defendants' position that part of why an alternative treatment plan was needed – the blood draws – was actually something that had to be done before he could have a surgical consult. In fact there was no evidence that Plaintiff needed to have labs done before his surgical consults in 2022. PSOF ¶¶ 106-109.

Further, Dr. Ritz admitted that he received the letter from Plaintiff's counsel with both the 2012 surgery records and the name of the hospital where the procedure was done in June 2019, but he did not do anything with that information or otherwise take steps to advance Mr. Hunter's care. PSOF ¶¶ 77-84. He did not pass these records off onto anyone at Pinckneyville. PSOF ¶ 82. He did not make sure that Dr. Butalid or Dr. Myers had the records so that they could revisit Mr. Hunter issue. PSOF ¶ 81. He said Dr. Lehman made a vague reference that he would "take care of it" referring to the legal and medical issues together. However, there was no indication in any of Mr. Hunter's medical records or from the medical staff who are still alive (Mr. Lehman has passed away) that any action was taken at all on the letter. PSOF ¶¶ 80.

Mr. Hunter's position is that these stated reasons are pretextual, and the Defendants wanted to avoid the cost of a surgical evaluation, evidencing deliberate indifference. *Foster,* 4 F. Supp. 3d 974 at 984 ("Choosing a treatment for a prisoner based on cost and not efficacy is evidence of deliberate indifference."); *Perez v. Fenoglio,* 792 F.3d 768, 777 (7th Cir. 2015) (deliberate indifference can occur when a prison official "acts in a manner contrary to the recommendation of specialists . . . or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering").

In the meantime, Mr. Hunter continued to experience rectal pain, acute and severe discomfort, mental distress, and a risk of infection. PSOF ¶¶ 3, 44-45, 59, 78. 95, 99. Mr. Hunter

complained about his condition at clinics and in mental health. PSOF ¶¶ 20, 69-71, 86. He had his lawyers send in his records and a plea for help, which was denied. PSOF ¶ 90. He filed a civil complaint asking for injunctive relief which Dr. Ritz ignored since inmates are "very litigious." PSOF ¶¶ 88. This delay lasted for over three years. *Foster*, 4 F. Supp. 3d at 981.

Finally, over three years after Dr. Myers originally requested that Mr. Hunter see a colorectal surgeon, plaintiff filed a motion for a preliminary injunction, and a letter from a gastroenterologist and hepatologist specialist, Northwestern University Professor Dr. David Shapiro, who warned that leaving Mr. Hunter's condition without a surgical consultation could increase the risk of infection and lead to even more severe symptoms like rectal incarceration – a medical emergency in which the rectum becomes stuck outside the body. PSOF ¶¶ 101-02. After reviewing Mr. Hunter's file, Dr. Shapiro found that Mr. Hunter had a rectal prolapse causing "difficulty with the defecation process and fecal incontinence." PSOF ¶ 103. Dr. Shapiro has stated that the standard of care in the treatment of rectal prolapse is surgery, and a surgical consultation is required. PSOF ¶ 103. In his opinion, Mr. Hunter was being denied the standard of care by not being provided with a surgical consultation. PSOF ¶ 103.

After the motion for preliminary injunction was filed, Wexford referred Plaintiff to a colorectal specialist. PSOF ¶ 107. In fact in spring 2022, Mr. Hunter saw two colorectal specialists, both of whom diagnosed him with a rectal prolapse. PSOF ¶¶ 106-07. There was no reason for this consultation to be delayed by three years. While Defendants argue that other providers wanted to look at the past records, there is no evidence that any other provider would have refused a consultation for three years without the records. Also, once Dr. Ritz had the records, he did not do anything with them. PSOF ¶¶ 76-85. He did not send them to Dr. Butalid or Dr. Myers so that they could re-present the issue, as they had supposedly agreed in the

alternative treatment plan. PSOF ¶¶ 31, 81. Courts have found that evidence that a medical director's failure to provide materials identified as missing for a consult and requested in utilization management created a factual dispute that the medical director was deliberately indifferent. *Gray v. Ghosh*, No. 11 C 5513, 2014 WL 3016129, at \*5 (N.D. Ill. July 3, 2014).

A jury could reasonably infer from the persistence and consistency of rectal prolapse symptoms between January 2018 and March 2022 that the lack of treatment of these symptoms caused Plaintiff rectal pain, severe discomfort, and anal seepage for four years. *See Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015) ("In other words, prisoner requests for relief that fall on 'deaf ears' may evidence deliberate indifference"); PSOF ¶¶ 3, 44-45, 59, 78. 95, 99 107. "The decision of a medical professional to do nothing, even though she knows that a patient has a serious medical condition requiring prompt treatment that the professional is capable of and responsible for providing, amounts to deliberate indifference." *Dobbey v. Mitchell-Lawshea,* 806 F.3d 938, 940 (7th Cir. 2015).

Here, Dr. Ritz knew that Dr. Myers recommended surgery and that Mr. Hunter was in pain. PSOF ¶ 24. Dr. Ritz could have approved Mr. Hunter for a surgical consultation, especially once the 2012 records were received. Instead he did nothing, extending Mr. Hunter's discomfort and pain for almost two more years. PSOF ¶¶ 76-85. A jury could find that this amounted to deliberate indifference. *See Wilson v. Wexford Health Sources, Inc.,* No. 18-CV-498-RJD, 2022 WL 815124, at \*9 (S.D. Ill. Mar. 17, 2022) (denying summary judgment to Dr. Ritz on claims that a three-month delay attributable to his collegial reviews constituted deliberate indifference).

### 2.   A Jury Could Find That Dr. Meeks Was Deliberately Indifferent To Mr. Hunter's Serious Medical Condition

Dr. Meeks had the ability to address Wexford's denial of care. PSOF ¶¶ 19, 43. Medical issues identified in the grievance process could have, and should have, been brought to Dr.

Meeks. PSOF ¶¶ 19-20. The grievance process here repeatedly failed Mr. Hunter. Through the grievance process, IDOC told Mr. Hunter that his request for surgery was denied and that Dr. Myers determined that he did not have rectal prolapse while Plaintiff knew that he did. PSOF ¶¶ 61, 86, 90. The grievance decision also told Mr. Hunter that his blood work was normal when actually no blood work had been done on Mr. Hunter between May 3, 2018 and August 1, 2018. PSOF ¶¶ 61-62, 66.

In June 2019 Dr. Meeks was notified by emails with Wexford that Mr. Hunter's counsel had written about concerns with his prolapse and continuing symptoms. PSOF ¶ 80. Still, nothing happened to advance Mr. Hunter's care for rectal prolapse. PSOF ¶¶ 76-85. His records were not passed onto or used by the medical team. PSOF ¶¶ 76-85. He was not provided with sanitary supplies. PSOF ¶¶ 91-95. The IDOC Defendants argue that a medical professional can rely on the judgment of another provider who has treated the inmate in taking an inmate's claim seriously. Dkt. 104 at 10. But here, the medical professional who examined Mr. Hunter in April 2018, Dr. Myers, recommended him for surgery. PSOF ¶ 27.

Unlike the case cited by the Defendants, *Johnson v. Snyder,* 444 F.3d 579, 587 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini,* 724 F.3d 965 (7th Cir. 2013), there is no evidence that Dr. Meeks or his staff tried other solutions for Mr. Hunter's prolapse. His surgical request was simply denied without offering any other remedy, using a colonoscopy to understand the prior surgery (as the colorectal specialist recommended, PSOF ¶ 109), trying other methods to find the place of Mr. Hunter's 2012 surgery, or even trying to find a provider who did not need the records. Here, a jury could find that Dr. Meeks knew of Mr. Hunter's medical issues, at least in June 2019, and turned a blind eye to it, allowing Mr. Hunter's

condition to continue completely untreated, amounting to deliberate indifference. *See Perez,* 792 F.3d at 781.

### 3.    A Jury Could Reasonably Find Wexford Liable for Violating Mr. Hunter's Eighth Amendment Rights

Under current precedent, private corporations like Wexford can be held liable for the violation of a prisoner's constitutional rights if there is evidence that of a "corporate[] policy or custom [that] gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). Plaintiff may establish Wexford's liability in a number of different ways. First, he may show that he was harmed as a result of an official corporate policy or regulation, or the failure to implement a policy. *Glisson*, 849 F.3d at 382; *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) ("An unconstitutional policy can include both implicit policies as well as a gap in expressed policies."). Second, he may demonstrate that his injury occurred as a result of a widespread, though unwritten, custom or practice. *Monell*, 436 U.S.at 690-91; *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Third, Plaintiff may show that the unconstitutional denial of medical care was committed by a person with final policymaking authority. *Monell*, 436 U.S. at 690-91; *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675-76 (7th Cir. 2009). Generally, the Seventh Circuit has recognized, "[t]hrough a bureaucracy that diffuses individual responsibility and accountability, healthcare in a prison or jail may be delivered (or not delivered) so that it is difficult or even impossible to assign the individual responsibility for deliberately indifferent failure that offers the simplest path to § 1983 liability." *Howell v. Wexford Health Sources, Inc.,* 987 F.3d 647, 655 (7th Cir. 2021). In that case, the plaintiff may bring a *Monell* claim against the entity with "evidence [that] suggests that he is the victim not of any one human being's deliberate indifference but of a system of medical care that

31

diffused responsibility for his care to the point that no single individual was responsible for seeing that he received the care he needed in a timely way. *Shields v. Illinois Dep't of Corr.,* 746 F.3d 782, 799 (7th Cir. 2014).

In this case, the evidence demonstrates that Wexford's liability stems from its utilization management system practice of requiring prior documents as applied to Mr. Hunter care. *See also Williams v. Wexford Health Sources, Inc.,* No. 1:17-CV-06121, 2022 WL 4132443, at *6 (N.D. Ill. Sept. 12, 2022) (during the utilization management review "the Wexford physician may request and review medical records related to the request" or consult outside consultants). Unlike Wexford's argument, the utilization management system did not provide Mr. Hunter with different care than he requested. Dkt. 97 at 8. It provided him with no care. PSOF ¶¶ 37038.The system did not require that a time frame be set for following up on a utilization management request for more records. PSOF ¶ 32. Dr. Ritz also testified that the utilization management process was to ask for records to get all objective information before making a referral. PSOF ¶ 32.. The utilization management process was not appealable by the inmates. PSOF ¶ 89. It provided a system by which Wexford could deny care, in contradiction to the recommendations of two of its doctors, without oversight. PSOF ¶ 32, 90, 43

Other courts have found that there are genuine issues of material fact related to a specific inmate about whether "Wexford had a policy of deliberate indifference—specifically their Utilization Management Procedures and collegial review process." *Southard v. Wexford Med.,* No. 317CV00839JPGRJD, 2019 WL 3322364, at *1 (S.D. Ill. July 24, 2019); *cf. Wilson v.,* 2022 WL 815124, at *9 (denying summary judgment to Dr. Ritz on claims that a three-month delay attributable to his collegial reviews constituted deliberate indifference). Here also, Plaintiff had previously complained that Wexford denied him care for rectal prolapse. The civil complaint

related to that complaint had the place of Mr. Hunter's 2012 surgery listed in it. *Hunter v. Sood*, Case No. 1:13-CV-02569, Dkt. No. 1 at ¶29.

As to Mr. Hunter, Wexford has essentially used its utilization management request for documents and its refusal to actually find and utilize those documents when it could have, as a "policy of inaction" as applied to Mr. Hunter for three years. *Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372, 382 (7th Cir. 2017). By pointing to the grievance process, IDOC, and other members of the Wexford team, Defendants have attempted to diffuse liability so that no one person can be held liable. Here, a jury can find that Wexford, as a spread-out entity, has a policy of inaction towards Mr. Hunter's medical condition.

## B.     The Wexford Defendants' arguments that there is no evidence of harm lacks merit

The Wexford Defendants argue that even if they were deliberately indifferent, their deliberate indifference did not cause Mr. Hunter harm because there is no evidence that Plaintiff would have had or could have benefited from surgery earlier. This argument lacks merit. First, the Seventh Circuit has repeatedly held that delayed treatment alone may be sufficient harm, even if there is no exacerbation of the underlying injury, where the delay causes a prolonged exposure to a painful condition. *Smith v. Knox Cnty Jail,* 666 F.3d 1037, 1040 (7th Cir. 2012)., ("deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim"); *Gomez*, 680 F.3d at 865-66 (plausible deliberate indifference claim based on four-day delay in treatment that prolonged plaintiff's pain, even though delay did not exacerbate injury); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d at 830-32 (7th Cir. 2009) (same); *Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007) (same for two-day delay); *Grieveson*, 538 F.3d at 779 (same).

Second, this argument essentially amounts to one of causation. That is, Wexford is arguing that their deliberate indifference did not cause Plaintiff any harm. Dkt. 97 at 10. Because "causation is normally a matter for the jury," *Conley*, 796 F.3d at 749, to survive summary judgment Plaintiff must only provide sufficient evidence "that allows the jury to infer that a delay in . . . treatment harmed" him, *Gayton v. McCoy*, 593 F.3d 610, 624-25 (7th Cir. 2010). Plaintiff's evidence rises well above that low threshold, both through his own testimony, Defendants' admissions, and the medical records in this case.

Third, the Wexford Defendants confusingly argue that Plaintiff would not have benefited from earlier surgery because 1) there is no evidence that even if Dr. Ritz had approved the surgery earlier, the surgery would have been performed; and 2) if the surgery had been performed, it may not have alleviated his complaints. Dkt. 97 at 10. To start, this argument interprets Mr. Hunter's medical need and his complaint too narrowly by focusing only on the requests for surgery and accepting Defendants' version of the facts that any provider would need the records before surgery. Instead, a Court looks at "the totality of an inmate's medical care when considering whether that care evinces deliberate indifference to serious medical needs." *Petties,* 836 F.3d at 728–29. Here, Mr. Hunter was asking for care and supplies for his prolapse. He did not get anything. PSOF ¶ 56, 91, 95. From the evidence produced here, a jury could find that doing *something* could have helped Mr. Hunter's pain and discomfort. To make their incorrect argument that Plaintiff had to show that the surgery would have alleviated his complaints, Defendants misrepresent *Petties v. Carter,* 836 F.3d 722, 733 (7th Cir. 2016). Dkt. No. 97 at 10. There the court did not find that the claim could not proceed against the doctor. *Id*. at 733. Instead, the Court found that even if deliberate indifference was not evinced when the plaintiff could not show that his specific requested would have benefited him, it was shown by

evidence that his preferred course of action was denied because it was "too expensive." *Id*. Here, the Defendants did not do anything for the prolapse.

Finally, there is no evidence to support Defendants' position that a rectal prolapse surgery would not address Mr. Hunter's medical problems. And even in cases where surgery was not the answer, where, as here, defendants were deliberately indifferent and caused the plaintiff harm for years, courts have allowed the claim to proceed. *See e.g., Davis v. Shah,* No. 12-CV-01068-MJR, 2013 WL 120216, at *4 (S.D. Ill. Jan. 9, 2013) (even when plaintiff refused a rectal prolapse surgery, he could have had a claim for alleged and documented pain and bleeding related to a rectal prolapse for a four-month period). Even a consultation with a rectal prolapse specialist, which Plaintiff was denied, could have provided some relief.  Accordingly, summary judgment on causation is inappropriate.

## II.   A reasonable jury could find IDOC liable under the Americans with Disabilities Act and Rehabilitation Act

By failing to provide Mr. Hunter with a surgical consultation for his rectal prolapse, IDOC violated the ADA and the RA. There is no question that Hunter's rectal prolapse constituted a known and observable medical disability. The record is also clear that Mr. Hunter was excluded from activities despite being qualified for them. The Court should deny IDOC's motion for summary judgment on the ADA and RA claims.

### A.   Mr. Hunter is disabled

The record shows that Hunter's rectal prolapse is a known and observable medical disability.  A disability "includes the limitation of one or more major life activities, which include walking, standing, bending, and caring for oneself." *Jaros v. Illinois Dep't of Corr.,* 684 F.3d 667, 672 (7th Cir. 2012). Because of his rectal prolapse, Hunter was limited in walking and bending—even a Pinckneyville doctor noted that Hunter lost control of his bowels during an

examination. PSOF ¶ 97. What in fact happened was that the doctor did not conduct the examination because he could see, not a bowel movement, but Hunter's rectal prolapse popping out. PSOF ¶ 97. Hunter is also limited in caring for himself, since handling the rectal prolapse on his own causes him pain, time, and risk of severe infection. PSOF ¶¶ 3-5, 91, 103. Even the physician's permission form that allows Hunter to have his single cell is called a "Physically Challenged (Handicapped) Request" by IDOC itself.  PSOF ¶¶ 54. IDOC also acknowledged Hunter's daily limitations from his rectal prolapse when giving him a lower bunk permit.  PSOF ¶¶ 16, 61.  Hunter is often confined to his single cell by his medical condition and is frequently in pain. PSOF ¶¶ 3-5, 91-100.

> **B.    IDOC denied Hunter programs, activities, and services based on his disability.**

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires public entities such as IDOC to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."  The RA is functionally identical to the ADA, with the added requirement that the defendant receive federal funding—which the IDOC does. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

IDOC cannot discriminate against Hunter by excluding him from the same level of "benefits of services, programs, or activities" that it offers inmates without rectal prolapse. 42 U.S.C. § 12132. This means that: The IDOC must "make reasonable modifications in policies,

practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless it can demonstrate that doing so would "fundamentally alter the nature of the services, program, or activity." 28 C.F.R. § 35.130(b)(7).

Under Title II of the ADA, IDOC is responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities. *Thomas v. Dart*, No. 17 C 4233, 2018 WL 4016315, at *4 (N.D. Ill. Aug. 22, 2018) ("[A]ccess to medicine or medical care or to a mental health program" is a service or program under the ADA). "[S]howering, toileting, and lavatory use" are also considered programs and/or services under the ADA. *See Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 916 (N.D. Ill. 2009); *Jaros*, 684 F.3d at 672 (meals and showers are programs and services that disabled prisoners must have the same level of access to as other prisoners).

Hunter was otherwise qualified to participate in the programs, services, and benefits offered by IDOC, including but not limited to access to medical services, the provision of a reasonably sanitary and hygienic means of using the restroom, access to meals, and the provision of settings in which prisoners can ambulate comfortably around the facility. Because of his disability Hunter was inhibited from safely using the bathroom. He could not regularly use the yard or exercise. It is difficult for him to use the dining hall or the legal library. He was not provided with sanitary products to address his biologically hazardous medical condition for years, PSOF ¶¶ 3-5, 91, 95,and he is unable to live in a reasonably hygienic cell. When a prison provides a prisoner with accommodations that leave them in so much pain that the pain prevents them from accessing services at the same level as other prisoner, that is a violation of the ADA.

*See Golden v. Illinois Dep't of Corr.,* No. 12-CV-7743, 2016 WL 5373056, at *3–4 (N.D. Ill. Sept. 26, 2016) (a prisoner stated a claim that his rights were violated under the ADA and the RA when the accommodations provided by IDOC—a prosthesis and various permits—still left him in so much pain that he missed three to four meals a week, four communal exercise sessions per month, and two religious services per month).

To say that Hunter is denying himself IDOC's services is dishonest.  Reviewing Hunter's disability against the services IDOC claims to provide him, which require him to leave his cell, move with severe pain, decrease his access to the bathroom, and bleed and leak around other prisoners without a sanitary and hygienic means of cleaning himself, makes it clear that IDOC is denying Hunter services despite him being otherwise qualified to participate. PSOF ¶¶ 91-100. 103IDOC's procedures, without an accommodation for his disability, make it impossible for Hunter to participate in the programs, services, and benefits IDOC offers. PSOF ¶¶ 91-100.  For example, when inmates go to the dining hall, the law library, or a job, they need to be given permission each time they need to go to bathroom. PSOF ¶¶ 91-100. It is no surprise, then, that Hunter must avoid activities outside of his cell that may last more than an hour or may require him to be around others with untreated rectal prolapse.  He does not have a choice.

The accommodations Hunter requested were reasonable. It is not that Hunter disagrees with the medical treatment he is receiving; it is that his rectal prolapse remains untreated.  He requested a necessary surgical consultation to determine whether and how this disability can be mitigated. This distinguishes Hunter's case from the case IDOC cited, *McGugan v. Aldana-Bernier*, 752 F.3d 224 (2d Cir. 2014), where the disabled plaintiff received medical treatment (forcible medication and hospitalization) that she did not agree with and believed occurred because of stereotyping of people with mental illnesses.

On this record, a reasonable jury could find that (1) Hunter is disabled and (2) IDOC denied

him services despite him being otherwise qualified to participate.  The Court should deny IDOC's

motion for summary judgment.

## II.   Defendant Meeks is not entitled to qualified immunity

When a defendant invokes qualified immunity, the court assesses first whether the facts

make out a violation of a constitutional right and then whether the right at issue was clearly

established at the time of the defendant's misconduct. *Pearson v. Callahan,* 555 U.S. 223, 232

(2009). The Supreme Court has emphasized the "importance of drawing inferences in favor of

the nonmovant" at the summary judgment stage. *Tolan v. Cotton,* 134 S. Ct. 1866, 1866 (2014)

(reversing grant of qualified immunity where lower court failed to do so); *see also Brosseau v.*

*Haugen,* 543 U.S. 194, 195 n.2 (2004).

As discussed above, a jury could find that Dr. Meeks was deliberately indifferent to Mr.

Hunter's serious medical needs. The evidence, construed favorably to Plaintiff, shows that Dr.

Meeks was involved in 2019 emails discussing the letter from Mr. Hunter's counsel regarding

this medical condition and prior records. These facts are sufficient to establish that Dr. Meeks

knew that the "care" Hunter was receiving was grossly inadequate and that he faced a substantial

risk of harm.

Moreover, Dr. Meeks' conduct violated clearly established law as it existed in 2018-

2020. In determining whether a right is clearly established, "it is unnecessary for the particular

violation in question to have been previously held unlawful." *Lewis*, 864 F.3d at 566 (citing

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Instead, the question is whether "the contours

of the right [are] sufficiently clear that a reasonable official would understand that what he is

doing violates that right." *Id.* (quoting *Anderson*, 483 U.S. at 640).

Since at least 1994, the right to be free from deliberate indifference by non-medical staff regarding a medical need has been established. *See Farmer*, 511 U.S. at 825 ("A prison official may be held liable under the Eighth Amendment for acting with 'deliberate indifference' to inmate health or safety," and "[p]rison officials have a duty under the Eighth Amendment to provide humane conditions of confinement" including "medical care."); *see also Lewis,* 864 F.3d at 566 ("It has long been clear that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.").

Further, it is well established that if an official has reason to believe a prisoner is not receiving adequate treatment for a serious medical condition, a failure to take steps to ensure that medical care is provided satisfies the personal liability requirement of § 1983. *See Berry,* 604 F.3d at 440 (jail administrator not deliberately indifferent where he consulted with medical staff and responded to prisoner's complaints); *Hayes,* 546 F.3d at 527 (non-medical defendants not deliberately indifferent where "they investigated [plaintiff's complaints, sought reports from medical officials, and relied on the judgment of the prison physicians"); *Johnson,* 433 F.3d at 1010 (prison official not deliberately indifferent to prisoner's medical needs because he did not disregard the prisoner's complaints, but instead investigated the situation to ensure medical staff were addressing the problem); *Greeno,* 414 F.3d at 656 ("Perhaps it would be a different matter if [the non-medical defendant] had ignored plaintiff's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address plaintiff's concerns.").

Drawing all inferences in Plaintiff's favor, Dr. Meeks knew of his serious medical need and did absolutely nothing in response. This violated clearly established law, and thus summary judgment on the basis of qualified immunity is inappropriate.

**CONCLUSION**

For the reasons set forth above, this Court should deny Defendants' motions for summary

judgment.

RESPECTFULLY SUBMITTED,

/s/ Lindsay Hagy
*One of Plaintiff's Attorneys*

Arthur Loevy
Stephen Weil
Lindsay Hagy, #6299944
Maria Makar
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, IL 60607
(312) 243-5900
lindsay@loevy.com
*Attorneys for Plaintiff*

**<u>Certificate of Service</u>**


I hereby certify that on this 13th day of June 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:


<div style="margin-left: 40%;">

Dennis S. Harms
Abbey A. Fritz
600 Washington Avenue - 15th Floor
St. Louis, MO 63101-1313
314-231-3332
314-241-7604 (Fax)
dharms@sandbergphoenix.com
afritz@sandbergphoenix.com
*Attorneys for Defendants Wexford Health Sources,*
*Inc. and Stephen Ritz, M.D.*

Tara M. Barnett
Assistant Attorney General
Metro East Office
201 West Pointe Dr., Ste. 7
Belleville, Illinois 62226
(618) 236-8781 Phone
(618) 236-8620 Fax
Email: tara.barnett@ilag.gov
*Attorney for Defendants Illinois Department*
*of Corrections, Steve Meeks, and Rob Jeffreys*



/s/ Lindsay Hagy
*One of Plaintiff's Attorneys*

</div>