IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANTONIO HUNTER,

      Plaintiff,

v.                                                                    Case No. 3:21-CV-271-NJR

ILLINOIS DEPARTMENT OF
CORRECTIONS, ROBERT JEFFREYS,
STEVE MEEKS, STEPHEN RITZ, and
WEXFORD HEALTH SOURCES, INC.,

      Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Antonio Hunter, an inmate within the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging Defendants violated his constitutional rights. (Doc. 1). Hunter claims IDOC and its employees, Robert Jeffreys[1] and Steve Meeks ("the IDOC Defendants"), as well as Wexford Health Sources, Inc., and its employee, Dr. Stephen Ritz ("the Wexford Defendants"), were deliberately indifferent to his serious medical needs. (*Id.*). He also asserts IDOC and Wexford violated the Americans with Disabilities Act ("ADA") and that IDOC violated the Rehabilitation Act ("RA"). (*Id.*).

Several motions are now before the Court, including a Motion for Leave to File an

---

[1] At the time Hunter filed his complaint, Robert Jeffreys was the Director of the IDOC. The IDOC has indicated that LaToya Hughes is now the Acting Director of the IDOC and, therefore, should be substituted for Jeffreys in her official capacity pursuant to Federal Rule of Civil Procedure 25(d). Accordingly, the Clerk of Court is **DIRECTED** to substitute Hughes as a defendant in Jeffreys' stead.

Amended Complaint filed by Hunter (Doc. 80), a Motion to Exclude Plaintiff's Expert Witness filed by the Wexford Defendants (Doc. 85),[2] and Motions for Summary Judgment filed by the Wexford Defendants (Doc. 96) and the IDOC Defendants (Doc. 103). The Court held oral argument on the motions on September 26, 2023. (Doc. 116).

For the reasons set forth below, Hunter's request for leave to amend the complaint is denied, and Defendants' motion to exclude Hunter's expert witness is granted. The Wexford Defendants' summary judgment motion is granted in part and denied in part, and the IDOC Defendants' summary judgment motion is denied.

#### MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

On September 14, 2022, Hunter filed a motion for leave to amend the complaint to add a *respondeat superior* theory against Wexford. (Doc. 80). The proposed claim states:

> While committing the misconduct alleged in the preceding paragraphs, the medical personnel caring for Plaintiff, including those named in this complaint and in his medical records, were employees and/or agents of Wexford and were acting within the scope of their employment and/or agency. Wexford is liable as principal for all torts committed by its employees and/or agents or on its behalf, and the resulting damages.

The Wexford Defendants oppose the motion, noting that the deadline to amend the complaint was November 1, 2021, and Hunter never sought to extend that deadline. (Doc. 83). Moreover, the deadline to complete discovery was August 22, 2022. Prior to that date, Hunter failed to serve any requests for admissions, interrogatories, depositions, or conduct any expert discovery. Instead, on August 22, 2022, Hunter filed a Motion for Extension of Time to Complete Discovery. (Doc. 69). The Court gave Hunter "a short

---

[2] The IDOC Defendants filed a Motion to Join, in Part, the Wexford Defendants' Motion to Exclude Plaintiff's Expert Witness. (Doc. 86). The motion to join is **GRANTED**.

extension . . . for Plaintiff's counsel to receive updated medical records, schedule depositions of Defendants, and produce Plaintiff for deposition." (Doc. 74). Plaintiff instead tried to schedule depositions for 10 fact witnesses and attempted to notice a deposition for an expert witness. Defendants sought clarification of the discovery order, and the Court clarified that Hunter was only given an extension to depose Defendants. (Doc. 81).

Defendants further argue that allowing Hunter to amend the complaint to add a medical negligence *respondeat superior* claim under Illinois law is untimely, without good cause, and would prejudice them.[3] The proposed state-law claims raise new legal theories and standards of review which significantly change the scope of discovery and potential liability. While Hunter's current legal theories are against Dr. Ritz and Wexford pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a *respondeat superior* claim would not necessarily be limited to the alleged conduct of Dr. Ritz but could theoretically apply to any Wexford employee. This expanded scope, they argue, would be unduly prejudicial to Wexford.

The Court agrees with Defendants that allowing Hunter to amend the complaint to add a new claim would be prejudicial to Defendants. This is not a case where Hunter proceeded *pro se* and was appointed counsel after discovery was well under way. Retained counsel filed the original complaint and could have completed discovery in a timely manner. Instead, they waited until the discovery deadline to request an extension

---

[3] Because Wexford is a private corporation, it cannot be held vicariously liable under § 1983 for its employees' deprivation of others' civil rights. *Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010). Thus, Hunter's proposed additional claim is necessarily a medical negligence claim.

of time, then attempted to complete discovery in a matter of two months. Moreover, the deadline to amend the complaint passed more than 10 months before Hunter sought leave to amend. Under these circumstances, it would be prejudicial to allow Hunter to add a new claim that could potentially require a significant amount of additional discovery. *See White v. Woods*, 48 F.4th 853, 860 (7th Cir. 2022) ("Undue delay and prejudice, together, may be sufficient reasons for denying an amendment."). Thus, Hunter's motion for leave to amend the complaint (Doc. 80) is denied.

## MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS

Defendants also ask the Court to exclude Hunter's expert witness due to his lack of diligence in litigating this case. (Docs. 85, 86). As noted above, the discovery deadline was August 22, 2022, the same day that Hunter filed a motion for an extension of the fact discovery deadline. Hunter's motion did not mention a request to conduct expert discovery. On August 26, 2022, the Court granted Hunter's motion and gave him a short extension to conduct limited fact discovery.  (Doc. 74).

On September 2, 2022, Hunter attempted to disclose Dr. David Shapiro as an expert pursuant to Rule 26(a)(2)(B). (Doc. 85-1). In an email to Plaintiff's counsel, Defendants objected to the late disclosure as it was a violation of the Court's order allowing an extension of the discovery deadline for limited fact discovery. (*See* Doc. 85). The parties sought clarification of the Court's order, and on September 15, 2022, the Court explained that the extension of the discovery deadline was for Defendants' and Plaintiff's depositions only. (Doc. 81).

Defendants now argue that Dr. Shapiro should be barred from providing expert

testimony because Hunter's disclosure was untimely and outside the scope of the Court's orders allowing limited additional discovery. Additionally, the Court's Scheduling and Discovery Order set the deadline to file *Daubert* motions as September 21, 2022, and counsel for Hunter never once mentioned expert discovery in any of its motions. Moreover, Defendants argue, the failure to disclose Dr. Shapiro was not justified or harmless considering Hunter was in possession of Dr. Shapiro's report since February 2022. *See* Rule 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). Finally, Defendants claim they are prejudiced by the untimely disclosure. While Defendants were aware of Dr. Shapiro's report since it was attached as evidence to Hunter's motion for preliminary injunction, Defendants had no notice that Hunter intended to use Dr. Shapiro as an expert witness.

In response, Hunter argues that the disclosure of an expert two weeks before the end of fact discovery is both justified and harmless. (Doc. 88). Hunter asserts that Dr. Shapiro's testimony is critical to his case and that exclusion of the testimony would be a drastic sanction given that the late disclosure was not made in bad faith and can be cured by allowing Defendants to depose Dr. Shapiro.

While Hunter's expert disclosure was not technically late, the Court granted Hunter a limited extended discovery period. The Court did not contemplate the disclosure of an expert witness or the requisite discovery that accompanies an expert disclosure in granting Hunter's request. Furthermore, the Court disagrees that Dr.

Shapiro's testimony is critical to Hunter's case. The Seventh Circuit has held that expert testimony is not required to prove a deliberate indifference claim, and Hunter can certainly testify as to the symptoms he experienced during the alleged delay in care. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("[A] non-trivial delay in treating serious pain can be actionable even without expert medical testimony showing that the delay aggravated the underlying condition."). For these reasons, the Court grants Defendants' motion to exclude Dr. Shapiro.

MOTIONS FOR SUMMARY JUDGMENT

Turning to Defendants' motions for summary judgment, the Court finds that the following facts not genuinely disputed.

Hunter was diagnosed with rectal prolapse[4] in 2011 and had surgery to repair it in April 2012. (Doc. 105-2 at pp. 6-7). As time went on, however, Hunter's rectal prolapse symptoms returned. (*Id.* at pp. 15-16). In November 2017, Hunter was admitted to IDOC's Northern Reception Center where rectal prolapse was recorded on Hunter's "problem list." (Doc. 105-10). Hunter was transferred to Pinckneyville in January 2018 and was granted a low bunk permit because climbing to the upper bunk sometimes caused him to have a bowel movement. (Doc. 105-11, 105-12).

Hunter saw a nurse on January 14, 2018, and explained his rectal prolapse issue. (Doc. 105-25). He told the nurse that his prolapse would not stop popping out, he had a stomachache, he had to use his hands to defecate, and he needed a single cell due to

---

[4] A prolapse is "the falling down or slipping of a body part from its usual position or relations." *Prolapse*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/prolapse (last visited Sept. 27, 2023).

bleeding and messing on himself. (*Id.*). Hunter testified that he had to use his hands to move the prolapsed tissue out of the way to evacuate his bowels. (Doc. 105-2 at p. 15). He further testified that this method of defecating is hard to control, causing his fecal matter to spray onto the wall, floor, toilet, and sink. (Doc. 105-3 at p. 9). Hunter also experienced anal seepage on a near daily basis in 2018, and he had to defecate upwards of eight times a day. (*Id.*; Doc. 105-2 at p. 9). He described the pain as 10 out of 10 when using the bathroom. (Doc. 105-3 at p. 9).

In February 2018, Hunter wrote a grievance requesting treatment for his rectal prolapse and, at the least, a single cell due to bleeding and defecating on himself. (Doc. 105-25). On March 17, 2018, Christine Brown, the IDOC's ADA Coordinator, wrote a memo in response to Hunter's grievance stating that he had been seen by the doctor on January 23, 2018, and did not raise issues with his "repaired prolapse." (Doc. 105-26). She stated that he had been given a low bunk permit and again noted that his prolapse had already been repaired. (*Id.*). Brown indicated that if Hunter was having issues, he needed to be seen on sick call. (*Id.*).

On April 19, 2018, Hunter went to the healthcare unit for severe rectal pain, difficulty moving his bowels, and rectal bleeding. (Doc. 105-13). He was referred to the doctor and was seen by Dr. Percy Myers on April 28, 2018. (Doc. 105-14). That same day, Dr. Myers placed Hunter in a single cell due to his fecal incontinence and began the collegial review process necessary to refer Hunter for a consult for a surgical correction since Hunter's prolapse symptoms had returned and he had extensive bleeding. (*Id.*; Doc. 105-16). Dr. Myers marked the request as urgent, meaning Hunter should see a

specialist within 30 days. (Doc. 105-16; Doc. 105-4 at p. 46).

Dr. Butalid, Pinckneyville's medical director, agreed with Dr. Myers that they should do a surgical referral, and he approved Dr. Myers's request. (Doc. 105-4 at p. 43). The request then went to Utilization Management at Wexford's corporate level to determine whether Hunter should be sent for offsite care. (*Id.*). At the time, Dr. Stephen Ritz was the Corporate Medical Director for Utilization Management for Wexford. (Doc. 105-7 at p. 6). Utilization management, through its collegial review process, determined whether an inmate was sent to an outside provider. (Doc. 105-4 at p. 43).

During collegial review with Dr. Ritz and Dr. Butalid on May 3, 2018, the surgical evaluation was denied because Hunter's "past records have not been obtained." (Doc. 105-35). An alternative treatment plan ("ATP") was created, which included re-presenting at collegial review when Hunter's medical records from his 2012 rectal prolapse surgery were obtained. (*Id.*). Dr. Ritz could have set a time frame for the completion of these tasks, but he did not. (Doc. 105-7 at p. 16). Dr. Ritz testified that Wexford's general practice when they did not consider a condition to be a medical emergency and it had been previously diagnosed or treated was to "try to get records to evaluate that to get as much objective information as we can." (*Id.* at p. 11).

That same day, Dr. Butalid wrote in a progress note that Hunter's surgical evaluation had been denied in collegial review. (Doc. 105-27). The ATP was to obtain Hunter's prior surgical records and do bloodwork—CBC, PT, and PTT labs—to check for excessive bleeding or clotting issues. (*Id.*; Doc. 105-6). A CBC lab counts a person's blood cells while PT and PTT labs indicate clotting factors. (Doc. 105-6 at p. 28).

Hunter signed a medical record authorization form to have his records released to Pinckneyville, but he did not know the name of the doctor or hospital that performed his 2012 surgery. (Doc. 105-24). The Wexford providers at Pinckneyville were responsible for getting the records of Hunter's past surgery. (Doc. 105-4 at p. 47). Pinckneyville staff received the records from the IDOC facility where Hunter was incarcerated at the time of his prior surgery, and Dr. Myers reviewed them, but there is no indication in the progress notes about the file review or what happened afterward. (*Id.* at p. 52).

On July 18, 2018, Hunter submitted an emergency grievance because he had not yet seen a surgeon and was still using his hands to release his bowels. (Doc. 105-25). Hunter also reported bleeding, stomach pain, and having to walk around with tissue in his rectum because of the bleeding. (*Id.*). Christine Brown responded to the July 2018 grievance, stating that when Hunter was seen in April 2018 for rectal prolapse, the doctor "did not see a prolapse and reported the offender was having a BM at the time of the exam. The offender reported past surgery to repair but no old records from previous surgery ha[ve] been found to date. Wexford denied surgery related to wanting old records and his lab results were all normal not indicating he was having severe rectal bleeding. The offender requested single cell and a low bunk which he was given. He has been seen in the HCU several times since this day with no mention of pain or rectal bleeding. If he is having issues he needs to go through NSC and be evaluated." (*Id.*). Thus, his grievance was denied on August 10, 2018. (*Id.*). Although Brown stated that Hunter's labs were "normal," there is no indication from Hunter's medical records that blood was drawn for the CBC, PT, or PTT labs in May, June, July, August, or September 2018.

(Doc. 105-29). CBC labs were drawn on October 2, 2018. (*Id*.).

During a mental health session on November 30, 2018, Hunter expressed frustration that he had not seen a surgeon for his rectal prolapse because, as Dr. Myers told him, Wexford would not approve it. (Doc. 105-19). Hunter again expressed his dismay over the lack of treatment for his rectal prolapse during a February 2019 psychiatric appointment. (Doc. 105-20).

Hunter testified that he could only go to gym and yard if his prolapse was not leaking, which was not very often. (Doc. 105-2 at p. 9). He wanted to play sports like basketball, but he couldn't because of his anal seepage and pain. (*Id*.). During Hunter's incarceration at Pinckneyville, Defendants never provided him with sanitary pads, diapers, wipes, cleaning supplies apart from the soap he bought, or other sanitary materials, despite the fact that he continued to have constant anal seepage. (Doc. 105-3 at p. 9). He asked to be able to use the bathroom outside of the schedule for activities like law library and school, but he was denied those requests. (*Id*.). While Hunter had a job in the commissary, he was unable to take any job in the yard or the grounds that would require him to seek permission to use the restroom. (*Id.* at p. 10).

In May 2019, Mr. Hunter underwent emergency surgery for a spinal condition. (Doc. 105-37). In preparing for surgery, the outside doctors examined Hunter's rectum and confirmed a rectal prolapse with no rectal tone. (*Id*.).

On June 7, 2019, Hunter's attorney wrote to Wexford, Dr. Steve Meeks, who was IDOC's Agency Medical Director, and Joe Ebbitt, Wexford's Director of Risk Management. (Doc. 105-30). The letter stated that Wexford and IDOC had all pertinent

medical records from Hunter's prior rectal prolapse surgery at Cook County Hospital, as they had been provided from Hunter's previous IDOC facility. (*Id.*). Nevertheless, counsel reattached those records to the letter. (*Id.*). The letter also explained that Hunter continued to have severe rectal pain and discomfort, he had to use his hands to defecate, and he had inadequate sanitation supplies for that process. (*Id.*).

Dr. Ritz and Ebbitt received the letter in early June 2019. (Doc. 105-8). IDOC administrative and operational leadership then received information about the June 2019 letter through emails with Dr. Ritz and attorneys for Wexford. (*Id.*). Dr. Ritz believed Dr. Tom Lehman, Wexford's Chief Medical Officer, would take care of the issue from a legal perspective and perhaps a medical perspective as well. (*Id.* at p. 14). There is no evidence, however, that Dr. Lehman took any steps to address the letter from a medical perspective, and Dr. Ritz did not follow-up with him to find out. (*Id.*).

Dr. Ritz also did not inform Dr. Butalid or Dr. Myers, who were on site at Pinckneyville, about the letter from counsel or provide them with Hunter's medical records. (*Id.*). In fact, Dr. Ritz and Wexford did not tell anyone at Pinckneyville that Hunter's prior rectal surgery took place at Cook County Hospital or otherwise make sure that this information was used to obtain the 2012 surgery records. (*Id.* at pp. 14-17). Dr. Ritz never re-raised the request for surgery at collegial review. (*Id.* at p. 10).

On March 10, 2021, Hunter filed this § 1983 action (Doc. 1) alleging three counts:

**Count I:**     Eighth Amendment Deliberate Indifference against Wexford, Dr. Ritz, Dr. Meeks, and Robert Jeffreys;

**Count II:**    Violation of the ADA against IDOC and Wexford;

**Count III:**    Violation of the Rehabilitation Act against IDOC.

On February 25, 2022, Hunter filed a motion for preliminary injunction in this Court seeking a surgical consultation for his rectal prolapse. (Doc. 52). Less than a week later, Dr. Myers examined Hunter. (Doc. 105-23). Dr. Myers noted that Hunter continued to have symptoms including rectal bleeding and needing to manipulate his bowels to have a bowel movement. (*Id.*). Dr. Myers also, for the first time, prescribed Hunter a package of wipes to help clean and handle his rectal prolapse. (*Id.*).

Dr. Myers diagnosed Hunter with very large hemorrhoids and submitted an urgent referral for Hunter to be seen by a colorectal surgeon. (*Id.*). The referral was approved, and a colorectal specialist saw Hunter on March 24, 2022. (Doc. 105-21). The specialist found that Hunter did not have hemorrhoids but, a "[r]ectal prolapse w/o anal sphincter tone. Anal seepage and drainage – constant." (*Id.*). The specialist referred Hunter to BJC in St. Louis for a colorectal surgeon consult for surgical repair of recurrent rectal prolapse. (*Id.*).

After a hearing on the motion for preliminary injunction, the parties informed the Court that Hunter's surgical consult had been approved by Wexford. (Doc. 63). Accordingly, on May 10, 2022, the Court denied the motion for preliminary injunction as moot. (Doc. 66).

On May 12, 2022, Hunter saw a colorectal surgeon at BJC in St. Louis, who found that Hunter had a "full-thickness rectal prolapse." (Doc. 105-22). He recommended that Hunter have:  (1) a colonoscopy and (2) surgical repair after his prior operation notes were received. (*Id.*).

On July 8, 2022, Hunter was released from Pinckneyville without ever receiving corrective rectal prolapse surgery. (Doc. 105-2 at p. 4).

### LEGAL STANDARD

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); s*ee also Ruffin Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).

Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events; hearsay evidence does not create a genuine issue of material fact. *Durling v. Menard, Inc.*, No. 18 C 4052, 2020 WL 996520, at *2 (N.D. Ill. Mar. 2, 2020) (citing *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or

conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.*

DISCUSSION

## I.   Deliberate Indifference to a Serious Medical Need

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on a claim of deliberate indifference, a plaintiff must show he suffered from an objectively serious medical condition and that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).

A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)) (internal quotation marks omitted). It is not necessary for a condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm") (internal quotation marks omitted) (emphasis added). Here, there is no dispute that Hunter's rectal prolapse was a serious medical condition.

Prevailing on the second prong requires a prisoner to show that a prison official had subjective knowledge of—and then disregarded—an excessive risk to the inmate's health. *Id.* at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Deliberate indifference involves intentional or reckless conduct, not mere medical negligence or malpractice. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

A. *Dr. Ritz*

Dr. Ritz argues that his involvement in Hunter's care was minimal: as part of the collegial review process, he simply asked for more information before approving Hunter's surgery. He asserts he was not responsible for following up on the ATP created during the May 2018 collegial review call; thus, he can only be found deliberately indifferent if his decision not to approve surgery equaled a total disregard for Hunter's welfare in the face of serious risks to his health. Dr. Ritz then points to the fact that the colorectal surgeon who examined Hunter in 2022 also wanted his prior surgical records before deciding whether to surgically repair the rectal prolapse. Dr. Ritz claims that this proves he met the standard of care and was not deliberately indifferent.

Dr. Ritz's argument is untenable given the undisputed facts. In 2018, Dr. Ritz knew that Hunter was in pain and discomfort due to his rectal prolapse, and he knew that both Dr. Myers and Dr. Butalid recommended a surgical consult. Dr. Ritz denied the referral for a colorectal surgery consult, in part, due to the lack of medical records from Hunter's

2012 surgery. While the ATP indicated that his case would be re-presented at collegial review once those records were obtained, when Dr. Ritz received the records in June 2019, he did nothing with them. He did not revisit Hunter's care in the collegial review process. He did not provide the records to Dr. Butalid or Dr. Myers so they could resubmit the referral for a surgical consult to collegial review. And he did not follow up with Dr. Lehman, Wexford's Chief Medical Officer, who he thought might be taking care of the issue. As a result, *three years* passed before Hunter saw a colorectal surgeon. A jury hearing this evidence could conclude that Dr. Ritz turned a blind eye to Hunter's serious medical needs in violation of the Eighth Amendment. *See Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) ("The decision of a medical professional to do nothing, even though she knows that a patient has a serious medical condition requiring prompt treatment that the professional is capable of and responsible for providing, amounts to deliberate indifference.").

Dr. Ritz argues that other outside doctors also requested Hunter's surgical records before deciding whether to perform surgery. Therefore, he could not have been deliberately indifferent in also requesting those records. Dr. Ritz cites to *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021), where the Seventh Circuit held that a doctor was not deliberately indifferent when he "was not alone" in deciding what drug to prescribe to a prisoner, as several other doctors had prescribed the same medication. In *Thomas*, however, the doctor was actually prescribing medical care, not deciding whether to do an initial consultation in the first place. The surgeons who requested Hunter's surgical records were determining whether Hunter was a surgical candidate in the face of his

diagnosed rectal prolapse. It is only logical that they would need to know what Hunter's prior surgeon did before performing another surgery. Dr. Ritz, on the other hand, was merely deciding whether to approve Hunter's *initial consultation* with a surgeon. The fact that Hunter's surgeons also wanted his prior surgical records is not dispositive of Dr. Ritz's liability.

Finally, Dr. Ritz argues there is insufficient evidence that Hunter suffered actual harm. That is, there is no medical evidence that Hunter would have benefitted from earlier surgery had Dr. Ritz approved the surgical consult in 2018. Dr. Ritz cites to *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019), but in that case, the plaintiff had "no evidence that *any* course of treatment, be it as simple as referral to a chiropractor or as involved as surgery at the finest hospital in Illinois, would have provided him any relief from his chronic back pain." Here, it is not genuinely disputed that Hunter would have benefited from some course of treatment. The surgeon Hunter saw in May 2022 recommended surgical repair of his prolapsed rectum. Given that the symptoms of Hunter's prolapse were largely the same between 2018 and 2022, a jury could find that Hunter would have benefitted from a surgical consult four years earlier.

Summary judgment is denied as to Dr. Ritz on Count I.

B. *Wexford Health Sources, Inc.*

While Wexford is a private corporation, under Seventh Circuit law, a private company that has contracted to provide essential government services, such as health care for prisoners, can be held liable if the constitutional violation was caused by an unconstitutional policy, practice, or custom of the corporation itself. *Hildreth v. Butler*, 960

F.3d 420, 426 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1527, 209 L. Ed. 2d 260 (2021); *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014).

To support a claim under 42 U.S.C. § 1983 on this theory, Hunter must show: (1) Wexford's practice violated his constitutional rights; and (2) the policy, practice, or custom was "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* "This requires more than a showing of one or two missteps." *Id.* (quotation omitted). There must be "systemic and gross deficiencies," of which policymakers were aware and failed to correct them, thereby "manifesting deliberate indifference." *Id.*

Here, Defendants argue there is insufficient evidence that a policy, practice, or custom of Wexford impacted Hunter's medical care. Defendants note that Hunter's request for a low bunk permit was approved, Dr. Myers placed him in a single cell, and Dr. Myers referred him for a surgical consult. While collegial review resulted in an ATP, that plan was followed through and Hunter was eventually approved to be seen by a colorectal specialist. Based on the above, Wexford argues that its providers timely responded to and evaluated Hunter's complaints.

In response, Hunter claims that Wexford had an unwritten policy of requiring prior medical records before a medical procedure would be approved through collegial review. And, because there is no set timeframe for requesting the records or a way for inmates to appeal decisions made in collegial review, he argues, this unwritten policy allows Wexford to deny care without oversight and in contradiction to the recommendations of its own doctors.

Hunter's argument fails, however, as he has failed to put forth evidence of a pattern of similar constitutional violations resulting from the policy. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021). In *Dean*, the Seventh Circuit Court of Appeals reaffirmed that a plaintiff "seeking to hold a municipality liable for a facially lawful policy" must provide proof of more than just a single incident "to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985)). The rationale for requiring a pattern of similar violations is that it "puts the municipality on notice of the unconstitutional consequences of its policy, such that its continued adherence to the policy might establish the conscious disregard for the consequences of its action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407–08 (1997) (cleaned up)). A pattern of violations also may demonstrate that the policy itself is the moving force behind the plaintiff's injury rather than a one-time, negligent administration of the program in question—here, the collegial review process. *See id.*

Hunter has provided no evidence of a pattern of similar violations in this case, instead pointing only to a "policy of inaction" toward his medical condition. That is not enough to defeat summary judgment on a *Monell* claim. *See id.* at 240 ("[W]e have repeatedly rejected *Monell* claims that rest on the plaintiff's individualized experience without evidence of other constitutional violations."). Thus, the Court finds that Wexford is entitled to summary judgment on Count I.

C. *Dr. Meeks*[5]

Dr. Meeks, IDOC's Agency Medical Director, argues that he is entitled to summary judgment on Hunter's deliberate indifference claim because a defendant must be subjectively aware of a plaintiff's serious medical need and personally involved in the deprivation of that medical care in order to be liable. In this case, however, Hunter concedes he never met Dr. Meeks. And, while Hunter's attorney sent a letter to Wexford and Dr. Meeks in June 2019, there is no evidence that Dr. Meeks ever received the letter or that he read it. Dr. Meeks further asserts he is entitled to qualified immunity because Hunter cannot establish a violation of his Eighth Amendment rights.

In response, Hunter argues that Dr. Meeks should have been aware, through Hunter's grievances, of his medical issues and the denial of surgery. Dr. Meeks also was notified by emails with Wexford that Hunter's counsel had written about concerns with his rectal prolapse and continuing symptoms. Furthermore, while IDOC argues that medical professionals may rely on the judgment of another medical professional who has already treated the inmate, in this case Dr. Myers had recommended Hunter for surgery. Thus, a jury could find that Dr. Meeks knew of Hunter's condition and turned a blind eye to it.

Dr. Meeks testified that he has no recollection of reading the letter, and there is evidence that the letter was not logged as having been received pursuant to IDOC's practices. (Doc. 104-3 at pp. 12-13; Doc. 104-5 at pp. 7-9). At the same time, Dr. Ritz

---

[5] In a footnote in his response to IDOC's summary judgment motion, Hunter states that he is no longer pursuing a claim of injunctive relief or deliberate indifference against the IDOC Director. (Doc. 106 at p. 23). Accordingly, Defendant Hughes is **DISMISSED without prejudice**.

testified as Wexford's corporate representative that there were e-mails apprising the IDOC's administrative leadership about Hunter's medical condition and the letter from his attorney. (Doc. 105-8 at p. 11). Viewing the evidence in a light most favorable to Hunter, the Court finds that a question of fact exists as to whether Dr. Meeks was aware of Hunter's condition and deliberately disregarded a serious risk to his health. And, because a jury could find that Dr. Meeks violated Hunter's Eighth Amendment rights, the Court also finds that Dr. Meeks is not entitled to qualified immunity. *See Pearson v. Callahan,* 555 U.S. 223, 232 (2009) (in assessing qualified immunity, the court must determine (1) whether the facts establish a violation of a constitutional right and (2) whether the right was clearly established at the time of the defendant's misconduct).

For these reasons, summary judgment is denied as to Dr. Meeks.

## II.     Americans with Disabilities Act and Rehabilitation Act

Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act prohibits any agency that receives federal funds from excluding, subjecting to discrimination, or denying the benefits of any of their programs to otherwise qualified individuals with disabilities. 29 U.S.C. § 794(a). Failure to make reasonable accommodations to ensure participation in the public entity's programs or services by a person with a disability qualifies as "discrimination." 42 U.S.C. § 12112(b)(5)(A).

"In the prison context, a plaintiff can make out a *prima facie* case of discrimination

under both the ADA and the Rehabilitation Act by showing: (1) he is a qualified person; (2) with a disability; (3) the Department of Corrections denied him access to a program or activity because of his disability or otherwise subjected him to discrimination; and (4) the denial or discrimination was by reason of his disability." *Farris v. Kurr*, No. 16-CV-272-SMY-RJD, 2018 WL 3036130, at *3 (S.D. Ill. June 19, 2018) (citing *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012)).

IDOC asserts Hunter has failed to show he is disabled because he has not provided evidence that his rectal prolapse substantially impaired the use of his bowels. Even if he was disabled, it argues, Hunter has failed to show that he was denied a program, activity or service based on that disability. Rather, the evidence is that Hunter participated in educational programs and had a series of jobs during his time of incarceration. Hunter also was offered gym and yard time, although he didn't always choose to use it. When he did attend those activities, Hunter testified that he did arm and stomach exercises and used weight-lifting machines at the gym. To the extent Hunter asserts he was not given accommodations in his cell for his sanitation, IDOC argues, the record does not support his claim. IDOC contends that Hunter could have asked a doctor to prescribe sanitary supplies, but there is no indication in the record that he ever did. Further, Hunter's claim regarding sanitary supplies amounts to a claim that he did not receive proper medical treatment, but the ADA cannot be used to litigate claims for inadequate treatment.

In response, Hunter asserts IDOC cannot discriminate against him by excluding him from the same level of "benefits of services, programs, or activities" that it offers inmates without rectal prolapse. Hunter argues he was otherwise qualified to participate

in the programs, services, and benefits offered by IDOC, including but not limited to access to medical services, the provision of a reasonably sanitary and hygienic means of using the restroom, access to meals, and the provision of settings in which prisoners can ambulate comfortably around the facility. Because of his disability, however, he was inhibited from safely using the bathroom, regularly using the yard, and it was difficult for him to use the dining hall or law library. He also was not provided with sanitary products to address his biologically hazardous medical condition, and he is unable to live in a reasonably hygienic cell. Thus, he argues, it is clear that IDOC is denying him services despite being otherwise qualified to participate.

As an initial matter, the Court finds that Hunter was disabled under the ADA and RA. A disability "includes the limitation of one or more major life activities, which include walking, standing, bending, and caring for oneself." *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). For purposes of the ADA, a "major life activity" includes "the operation of a major bodily function" such as the bowel. 42 U.S.C. § 12102(2). The Court finds that Hunter has presented evidence that his rectal prolapse impaired the use of his bowels such that he was impeded from caring for himself in a customary and sanitary way. He also could not walk at times without experiencing anal leakage or climb to an upper bunk without having a bowel movement. Thus, the Court finds Hunter was disabled within the meaning of the ADA and RA.

There is also evidence that Hunter was denied access to IDOC programming because of his disability. While the Court agrees that Hunter was able to partake in some of the prison's programming, the record demonstrates that his participation was limited

by his disability. Hunter testified that he signed up for educational programs where the materials were brought to his cell and in-class programs that lasted approximately one hour, but he avoided any classes that lasted longer because he was unable to use the restroom as needed. (Doc. 105-3 at p. 4). He also avoided signing up for chapel or any of its activities because they lasted longer than an hour. (*Id.*). Not being able to use the restroom when needed caused him both pain and anal leakage, and he was not provided with diapers or sanitary pads to help with the issue. (*Id.* at pp. 8-9). Furthermore, while IDOC claims Hunter never asked for accommodations, Hunter testified that he asked for hygiene items, extra tissues, and cleaning supplies but was told he had to purchase those items at commissary. (*Id.* at p. 4).

A jury crediting Hunter's testimony could find that the IDOC violated the ADA and RA when it failed to accommodate Hunter's rectal prolapse. Accordingly, the Court denies summary judgment to the IDOC on Counts II and III.

Because Wexford did not move for summary judgment on the ADA claim against it in Count II, that claim also survives.

### CONCLUSION

For these reasons, the Motion for Leave to File an Amended Complaint filed by Plaintiff Antonio Hunter (Doc. 80) is **DENIED**.

The Motion to Exclude Plaintiff's Expert Witness filed by the Wexford Defendants and joined by the IDOC Defendants (Doc. 85) is **GRANTED**.

The Motion for Summary Judgment filed by the Wexford Defendants (Doc. 96) is **GRANTED in part and DENIED in part**. Hunter's claim against Wexford in Count I is

**DISMISSED with prejudice**. Summary judgment is **DENIED** as to the claim against Dr. Ritz in Count I.

The Motion for Summary Judgment filed by the IDOC Defendants (Doc. 103) is **DENIED**.

Plaintiff Antonio Hunter shall proceed on the following counts:

| | |
|---|---|
| **Count I:** | Eighth Amendment Deliberate Indifference against Dr. Ritz and Dr. Meeks; |
| **Count II:** | Violation of the ADA against IDOC and Wexford; |
| **Count III:** | Violation of the Rehabilitation Act against IDOC. |

A status conference will be set by separate order to discuss the potential for mediation and to set this case for trial.

**IT IS SO ORDERED.**

**DATED:   September 28, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**