IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Antonio Hunter, | |
| Plaintiff, | Case No. 21-cv-271-NJR |
| v. | |
| Stephen Ritz, | JURY TRIAL DEMANDED |
| Defendant. | |

**PLAINTIFF'S MOTION TO COMPEL DEFENDANT TO PRODUCE
EMAIL COMMUNICATIONS RELATING TO 2019 LOEVY & LOEVY LETTER[1]**

Plaintiff Antonio Hunter, by his undersigned counsel, respectfully moves the Court for an order compelling Defendant Steven Ritz to produce an internal Wexford Health Sources email chain concerning a 2019 letter from Plaintiff's counsel to counsel for Wexford about Plaintiff's ongoing medical condition. This letter attached the very medical records that Defendant claimed to need before approving care for Plaintiff's condition, meaning that if Defendant learned these records had been received but still did not approve care, his stated need for them was likely pretextual all along.

During discovery, Defendant withheld these emails on the basis of attorney-client privilege. During the trial of this case last year that ended without a verdict, Defendant provided selective, self-serving testimony about the email chain and Defendant's attorney specifically disclaimed any intention to continue invoking attorney-client privilege as to the email chain. To the extent the email chain was ever subject to the attorney-client privilege, those actions of Defendant and his

---

[1] Plaintiff filed another motion on this subject on the eve of trial, which the Court denied as moot following trial. Dkt. 180 (Plaintiff's Motion *in limine* Regarding Defendant's Communications Relating to 2019 Loevy & Loevy Letter); Dkt. 221 (January 15, 2025, Order Denying All Pending Motions). The current motion, unlike the previous one, is premised in large part on events that occurred at trial.

1

counsel during the prior trial have now unequivocally waived the privilege. The emails must be produced to Plaintiff in advance of the June 9 retrial.

## BACKGROUND

During one of Defendant Ritz's depositions in this case, he revealed that he and other Wexford executives exchanged multiple emails about a June 2019 letter from Plaintiff's counsel to the counsel for Wexford. This letter alerted Wexford that Mr. Hunter's rectal prolapse still had not been repaired and that he was still suffering grievously. The letter also attached medical records from a previous surgery, records that Defendant Ritz claimed he needed to review before approving treatment. A copy of the letter (with attachments) is attached here as Ex. A.

During the deposition, Plaintiff's counsel asked Dr. Ritz questions about the content of these highly relevant communications, but defense counsel asserted that the emails were protected from disclosure by the attorney-client privilege. Dr. Ritz refused to discuss them further, except to volunteer the self-serving claim that one of the emails included a statement from Dr. Thomas Lehman, a Wexford executive who is now dead, that Lehman would "take care of" the issues that the letter raised:

> Q   [W]ere there any steps taken in regards to this [2019 Loevy] letter as related to Mr. Hunter's medical care?
> A   I didn't see any specific evidence of any steps taken that was documented. It doesn't mean it didn't happen. **There was an e-mail that -- from Dr. Lehman that alluded to that he was going to communicate something to someone that he was, I think, was going to take care of it.**

Ex. B at 31:20–32:3 (emphasis added). When Plaintiff's counsel followed up and asked for more detail about *that* communication, Dr. Ritz's attorney re-asserted privilege, and Dr. Ritz refused to say more:

2

> Q. And did you have any indication that Dr. Lehman was going to do anything specifically related to Mr. Hunter's medical care?
> A. Other than what I attested to earlier, his e-mail that just alluded acknowledging his communications with Mr. Ebbitt and that **he was going to take some form of action**. . . .
> Q. And did his e-mail indicate that he was going to do anything specifically related to Mr. Hunter's medical care?
> MS. FRITZ: **I'm going to object because that's attorney-client privilege.**
> Q. Okay. Are you going to take your attorney's advice and not answer?
> A. **Yes**.

*Id.* at 42:3–21 (emphasis added). The portion of the deposition concerning the email chain is attached as Ex. B to this motion. *See id.* at 31:10–45:10.

Following his deposition, Defendant Ritz never provided a privilege log and never disclosed even a redacted version of the emails, nor did he disclose a list of the persons on the chain. Plaintiffs were also left in the dark as to whether the letter from their counsel and the medical records that accompanied the letter were attached to the emails or merely referenced.

Concerned that Defendant Ritz might seek at trial to put the responsibility for Plaintiff's medical case on Dr. Lehman—who obviously is no longer able to deny responsibility—Plaintiff moved *in limine* to bar that argument. Dkt. 168 at 11–12. When that motion was largely denied (Dkt. 177 at 23), Plaintiff sought to compel the production of the emails to enable adequate cross-examination, asserting that Defendant's invocation of privilege was "classic sword-and-shield abuse" (Dkt. 180 at 2). That motion, filed on the eve of trial, was not decided before or during trial (and has since been denied as moot, Dkt. 221).

During the trial, Defendant Ritz and his counsel took full advantage of the opportunity to transfer responsibility for addressing Plaintiff's medical needs from Dr. Ritz to others on the email

3

chain. Ritz evaded making a direct admission that he knew of the information in the letter from Plaintiff's counsel by repeatedly claiming to lack memory about the email chain.

For example, the following exchanges took place at trial when Plaintiff's counsel asked Dr. Ritz about aspects of the emails that he had previously revealed during his deposition:

> Q. The Risk Management Director notified you about this letter, right?
> A. I wouldn't say that he notified me. As I recall, there was an e-mail chain sent out to multiple individuals, including our management team, our administrative and our regional medical directors in Illinois, which would be consistent with the way that these types of matters are usually handled. They were not handled at the corporate medical level; they were usually reviewed and handled at the site and state leadership level.
> . . . .
>
> Q. And you said there were a number of people included on the e-mail from the risk management director. Was anyone who works on-site at Pinckneyville included?
> A. I don't recall as I sit here exactly who was actually copied on those. I just know it was a number of people.
> Q. Okay. And you're one of the people that Risk Management thought should know about this letter?
> A. I believe I was copied on the e-mail chain, yes.
> Q. About this letter?
> A. I believe it was the e-mail -- or the letter was referenced, yes.
> Q. Did the e-mail from Mr. Ebbitt summarize the letter?
> A. I don't recall.
>
> . . . .
> Q. . . . . [M]y question is did the e-mail from Mr. Ebbitt to you and others summarize this June 7, 2019 letter?
> A. I don't recall exactly what it did summarize as I sit here.
> Q. Okay. Did you send an e-mail to Mr. Ebbitt in response to his e-mail about this letter?
> A. I believe I may have responded to him, yes. That would be, again, my customary practice.
> Q. Are you saying you do not recall whether you responded?
> A. I did not review all the e-mail thread recently and, as I

4

said, I don't remember specifically what I may have responded
to or not. I really don't recall, but I believe that I did.
Q. Okay.

. . . .

Q. . . . . You said you believe you responded, but you don't know, right?
A. I don't recall specifically, but I believe that I did.
Q. Okay. And you testified in a deposition in this case last
year, right?
A. I did.
Q. Okay. And you were asked, "Okay. So some of the e-mails
were addressed to you?" And your answer was, "There was one
e-mail that I addressed back to Mr. Ebbitt."
Were you asked that question and did you give that
answer?
A. That sounds correct, but I think I am getting a little
confused, because I gave two different depositions; one I was
a corporate representative and one was for myself. And so I
may be getting that issue confused in my head, but I --
whatever I answered in my deposition was factually accurate
and I would stand by that today.
Q. Okay.
A. Yes.
Q. Thank you. Did you take any action after receiving notice
of this letter from Antonio Hunter's attorneys about his
prolapse?
A. If I would have seen the letter, I would -- customarily
would have definitely taken action. Now, as I testified
earlier, it was not typically my role as the UM medical
director to get involved with issues that came in from
attorneys or from families. We had a process for that, which
is why Mr. Ebbitt, our Risk Management Director, was involved
in directing this letter and sending out the e-mails to our
on-site team. But, had I seen the letter itself, I most
likely would have acted upon it.
Q. You were notified of the existence of the letter? This is
established, right?
A. Yes, it was referenced in the e-mail chains, yes.
Q. And you responded. You got the e-mail?
A. I got the e-mail and I think the letter was referenced.
If it was attached and copied and I reviewed that, I'm not
sure.
Q. So you may have reviewed the letter; you don't know?
A. I don't recall if I did or not. If I would have, I would
have taken action on it, most likely.

> Q. Is there any evidence that you took any action based on this letter?
> A. Not that I have seen, no.
> Q. Okay. And you've testified before that, as far as you can tell, no action was taken by anyone in response to this letter?
> A. I don't know what action was taken at the site level in terms of documentation. As I recall, my previous testimony regarding this in the depositions is that sometimes these matters will be handled verbally and there may not have been a documented record of those verbal conversations. But, no, I don't recall that there's any documentation of any action.

Ex. C (Day 3 Trial Transcript) at 464:1–465:8, 474:25–478:7. Then, during closing arguments, counsel for Defendant Ritz contended that responsibility for addressing Plaintiff's medical needs resided with the others on the email chain, not Ritz:

> Next, the lawyer letter. . . . The letter was not sent to Dr. Ritz. He was one of seven recipients of an e-mail that discussed the letter. He deferred to his colleagues. Similarly to the collegial review, the local folks are the ones in the best position to figure out what is going on. Included in the seven people that were sent the e-mail were Illinois medical directors.

Ex. D (Day 4 Trial Transcript) at 652:6–17.

It would be unfair to allow Dr. Ritz to testify again at retrial that he does not recall receiving critical information or that he might have "deferred to his colleagues" about that information while barring Plaintiff from access to emails that might refresh Ritz's recollection and demonstrate what if any "deference" Ritz actually made—all on the basis of an unfounded claim of privilege.

## ARGUMENT

Any privilege that may have covered these emails has been thoroughly waived, and the emails must now be produced to Plaintiff, or he will be unable to adequately challenge self-serving statements that Defendant will undoubtedly make about them at the June 2025 retrial. As it stands, the jury will hear only the features of the communications that are favorable to Defendant, and

6

Plaintiff will be stuck with Defendant's assertion that he does not recall important aspects of the emails. For example, Defendant was unsure whether the emails contained a summary of the letter from Plaintiff's counsel and unsure whether the letter itself was attached. He also suggested on-site doctors at Pinkneyville may have received the emails. These are all questions that would be easily resolved by reviewing the emails.

Defendant has waived whatever attorney-client privilege may once have attached to the emails. "Generally, a party that voluntarily discloses part of a conversation covered by the attorney-client privilege waives the privilege as to the portion disclosed and to all other communications relating to the same subject matter." *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1024 (7th Cir. 2012); *See Goldman, Sachs & Co. v. Blondis*, 412 F. Supp. 286, 288 (N.D. Ill. 1976) (instructing "privilege may be waived by testimony of the client in an examination before trial'). In this case, both Defendant and his counsel have unquestionably "disclos[ed] part of a conversation," meaning the email communications.

When a disclosure of otherwise protected material is made in a federal proceeding, Federal Rule of Evidence 502(a) provides that "waiver extends to an undisclosed communication or information . . . if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." In this case, where Defendant "intentionally put[] protected information into the litigation in a selective, misleading and unfair manner," "fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502, Advisory Committee Notes to Subdivision (a). Courts regularly require disclosure under these circumstances. *See Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-CV-660-DRH-SCW, 2015 WL 13713551, at *1 (S.D. Ill. Sept.

28, 2015) (citing Fed. R. Evid. 502 and advisory committee notes and requiring disclosure of documents "to prevent selective disclosure").

Moreover, defense counsel told the court during the prior trial that he was not maintaining a privilege objection to the contents of the emails. This explicit waiver occurred after defense counsel objected to Plaintiff's counsel's questioning about the e-mails and requested a sidebar. In that colloquy, defense counsel (presumably recognizing that his client had waived the privilege and that the selective waiver helped the defense case) made clear that he was not making a privilege objection about the content of the e-mails:

> Q. Okay. And you're one of the people that Risk Management thought should know about this letter?
> A. I believe I was copied on the e-mail chain, yes.
> Q. About this letter?
> A. I believe it was the e-mail -- or the letter was referenced, yes.
> Q. Did the e-mail from Mr. Ebbitt summarize the letter?
> A. I don't recall.
> Q. Have you seen the e-mails about this letter?
> MR. HARMS: Your Honor, I object. Can we approach?
> THE COURT: We may. Ladies and gentlemen, stand up and stretch.
> (Proceedings heard at sidebar; outside of jury's hearing)
> THE COURT: What is your question?
> MR. HARMS: Your Honor, we have dealt with this previously in multiple different times getting into the substance of these letters. *I'm not making a privilege objection about what's in there. But to the extent this is an effort to open the door, I object to that effort to open the door.*

Ex. C at 465:1–21 (emphasis added). A privilege objection not made at trial is waived on retrial.

2 Wright & Miller, § 5033 n.8 (citing 7 Adams & Weeg, Iowa Practice: Evidence, 1998, p. 41; 5 Tegland, Washington Practice: Evidence, 4th ed.1999, p. 40).

Finally, the doctrine of judicial estoppel protects against the kind of tactical shifts in position that Defendant has engaged in here. Defendant asserted privilege during his deposition and in his response to Plaintiff's Motion *in limine* (Dkt. 173 at 9) but then disclaimed this position at trial. The Supreme Court has explained that judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotation marks omitted). Estoppel applies when the party to be estopped—here, Defendant—takes a later position that is "clearly inconsistent" with its earlier one and would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (quoting *New Hampshire*, 532 U.S. at 750–51). Defendant's disclaiming of privilege at trial is inconsistent with his pre-trial assertions of privilege and gives Defendant an unfair advantage.

In sum, the Court should order production of the emails. These emails are crucial evidence of notice to Defendant Ritz of Plaintiff's ongoing medical condition and of the location of Plaintiff's past medical records, which Defendant claimed to need before he could approve specialist care for Plaintiff's serious medical need. Considering Defendant and defense counsel's reliance on these emails at the mistrial, no privilege can justify withholding this evidence from Plaintiff.

## CONCLUSION

For the above reasons, Plaintiff respectfully requests that the Court compel Defendant Ritz to produce the withheld internal Wexford emails concerning the 2019 letter from Plaintiff's counsel.

Respectfully submitted,

**ANTONIO HUNTER**

By: /s/ Julia Rickert
*One of Plaintiff's Attorneys*

Jon Loevy
Locke Bowman
Julia Rickert
Maria Makar
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
T: (312) 243-5900
F: (312) 243-5902
julia@loevy.com

## CERTIFICATE OF SERVICE

I, Julia Rickert, an attorney, hereby certify that on April 1, 2025, I caused the foregoing document to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Julia Rickert
*One of Plaintiffs' Attorneys*