IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Antonio Hunter,<br><br>      Plaintiff,<br><br>v.<br><br>Stephen Ritz,<br><br>      Defendant. | Case No.  21-cv-271-NJR<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT**

Plaintiff Antonio Hunter, by his undersigned counsel, respectfully moves the Court for entry of judgment in Plaintiff's favor as a sanction for misconduct committed in this litigation by Dr. Stephen Ritz, the defendant, and his counsel. In support, Plaintiff states as follows:

**INTRODUCTION**

Our system of civil litigation depends on lawyers acting with integrity and ensuring that their clients also do so. But two days ago, Plaintiff learned from previously withheld emails that the defense in this case has for years misled Plaintiff, the Court, and the prior jury about facts central to Plaintiff's claim that Dr. Ritz was deliberately indifferent to his serious medical need. These emails show that Dr. Ritz was fully apprised of Mr. Hunter's medical situation and was indeed responsible for addressing it, contrary to Dr. Ritz's past testimony and defense counsel's closing argument in the first trial. Under any fair analysis, Dr. Ritz's knowing lies (shielded by his confidence that Plaintiff would never have access to the withheld emails) made a mockery of that trial. Judgment for Plaintiff is the most appropriate sanction under these circumstances, and the impending trial should be on damages alone. "False testimony in a formal proceeding is intolerable. We must neither reward nor condone such a flagrant affront to the truth-seeking

1

function of adversary proceedings." *ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994) (internal quotations marks omitted).

## BACKGROUND

Mr. Hunter went to the healthcare unit of Pinckneyville correctional center in April 2018, complaining of a recurrent rectal prolapse that was causing him great distress. He was examined by a Wexford employee, Dr. Meyers, who concluded that Mr. Hunter needed to see a colorectal surgeon. Dr. Meyers submitted an urgent referral request, which was conveyed to Dr. Ritz, whose approval was needed for Mr. Hunter to see a specialist. Dr. Ritz, however, denied the request and directed that Plaintiff's records from a 2012 surgery be obtained before any renewed request for a referral was made. Dr. Ritz set no deadlines and gave no instructions to the medical staff at Pinkneyville about what to do in the event the 2012 records could not be located.

Over a year later, in June 2019, counsel for Plaintiff sent a letter to Wexford explaining in detail that Mr. Hunter had received no treatment for his prolapse and was suffering grievously. The letter also explained that the 2012 surgical records were enclosed with the letter, in case Wexford had not managed to obtain them. Yet Mr. Hunter still was not sent to a specialist—he would have to wait three more years for that.

Dr. Ritz was asked about the 2019 letter during two depositions taken in this case on the same day in February 2023, the first in his individual capacity and the second under Rule 30(b)(6) as a representative of his employer, Wexford Health Sources. During the 30(b)(6) deposition, Plaintiff's counsel learned for the first time that Wexford had withheld certain internal emails concerning the 2019 letter as attorney-client privileged. Dr. Ritz testified that he had reviewed these privileged emails to prepare for his deposition so that he could answer

questions about Wexford's response, if any, to the 2019 letter.[1] The contents of the emails were therefore fresh in Dr. Ritz's mind as he testified, and undoubtedly he had taken particular note of anything he wrote himself or that referenced him personally. Although Wexford's privilege assertion over these emails has now been revealed to be baseless by the emails themselves,[2] at the time Dr. Ritz testified in his depositions—and later at trial—he did so under the (mistaken) belief that Plaintiff would never see the emails.

Although Wexford's counsel asserted privilege over most questions about the emails, simultaneous with these assertions of privilege, Dr. Ritz did provide certain material information. Beginning in his individual deposition, Dr. Ritz said he could not recall ever seeing the 2019 letter and did not know whether anyone had ever shown it to him.[3]

---

[1] Ritz 30(b)(6) dep. at 17-22:

> Q·  · Okay.·  And what did you do to prepare to answer questions for topic 10, which was whether any follow up was taken or any follow up taken in response to plaintiff counsel's June 7, 2019 letter?
> **A·  · I reviewed the submitted e-mail documents and discussed this with Mr. Ebbitt.**

[2] The emails copy an attorney but are not addressed to the attorney and do not contain any attorney communications or requests for legal advice. Future assertions of privilege by Wexford attorneys will warrant the utmost scrutiny.

[3] Ritz individual dep at 64:17-65:1:

> Q·  · Okay.·  Okay.·  So I want to ask you about the -- this letter, but only, at this point, only in your personal capacity if you had seen it, or if anyone showed it to you, but just you as an individual.·  I know this is a little tricky.
> **A·  · As I sit here, I don't recall ever having seen the letter.**
> Q·  · Okay.·  Okay.·  So you don't have any memory of being shown a letter from Mr. Hunter's counsel?
> **A·  · No, I don't recall.**

3

When he testified later that day as a corporate designee, Dr. Ritz explained that the email chain he reviewed had been initiated by Joe Ebbitt, Wexford's risk management director.[4] He conceded that he (Ritz) was one of several recipients listed on these emails,[5] but he denied that the 2019 letter was attached to the email from Mr. Ebbitt.[6] He also denied there was any evidence of communications about the letter outside the emails.[7] He conceded that no evidence showed action was taken to address the issues raised in the letter, but he testified that Dr. Lehman, who was the acting Chief Medical Officer at the time, wrote in one of the emails that he would "take care" of the issues raised by the letter.[8] Dr. Ritz even lamented that, because

---

[4] Ritz 30(b)(6) dep. at 17:6-10:

> A·· [Ebbitt] then contacted counsel and he also contacted via e-mail myself, Dr. Tom Lehman, L-E-H-M-A-N, who was the acting or the chief medical officer at that time.· Dr. Maddox and Funk, and I believe Ms. Stock-Jones as well as counsel.

[5] *Id.*

[6] Ritz 30(b)(6) dep. at 23:5-7:

> Q·· When Mr. Ebbitt sent you the e-mail related to this letter, was the letter attached to the e-mail?
> A·· **There was no evidence of that, no.**

[7] Ritz 30(b)(6) dep. at 29:15-23:

> Q·· Well, sure.· Were there any communications after the e-mails?
> A·· **There was nothing that I saw documented or evidence of any communication.**
> Q·· Were there any communications that you learned of that took place after the e-mails?
> A·· **Not that I saw any evidence of, no.**
> 22···· Q·· Okay.· Or that Mr. Ebbitt told you about?
> 23···· A·· **No.**

[8] Ritz 30(b)(6) dep. at 31:20-32:17:

Dr. Lehman is deceased, there is no way to find out what he meant or what he did in response to the letter.[9] Ritz also testified that, normally, the regional medical directors would have been tasked with reviewing the medical aspect of such a case, and he suggested that they likely would have been tasked with it in this instance.[10]

---

> Q· · Okay.· And were there any steps taken in regards to this letter as related to Mr. Hunter's medical care?
> **A· · I didn't see any specific evidence of any steps taken that was documented.· It doesn't mean it didn't happen.· There was an e-mail that -- from Dr. Lehman that alluded to that he was going to communicate something to someone that he was, I think, was going to take care of it.· But -- and customarily, as I attested many times, these things would've been handled and discussed verbally.· It wouldn't necessarily have had any documentation.· So I guess the point being that the fact that there's not formal documentation noted anywhere doesn't mean that it didn't happen.· It may have happened.· Unfortunately, Dr. Lehman is deceased, so he's not able to attest to that.**
> Q· · Okay.· And what was Dr. Lehman's role?
> **A· · He was the chief medical officer.**
> Q· · For Wexford?
> **A· · Yes.**
> Q· · And so he said that he was going to take care of it from a medical care perspective?
> **A· · I can't attest to what he meant by that.**

[9] *Id.*

[10] Ritz 30(b)(6) dep. at 33:15-34:8:

> **A· · []So the review of the medical piece generally is going to be done by the regional medical directors and the site medical directors as part of the process.**
> Q· · And so what was done to follow up on the medical piece of this letter?
> MS. FRITZ:· Objection.· Asked and answered.
> **A· · There -- there's no documentation of what actually transpired.· Again, customarily, there may not be because it would've been discussed verbally.**

During his trial testimony the following year, Dr. Ritz denied being able to remember if the 2019 letter had been attached to the emails he reviewed or whether he ever saw the letter, but he claimed it was unlikely he had seen it.[11] If he had, he explained, he "most likely" would have taken action, yet no evidence suggests he took action.[12] Dr. Ritz also testified that, regardless, it had not been his responsibility to take any action with respect to this letter.[13] (The Court

---

[11] Trial tr. at 477:15-23:

> Q.  Okay.  And was -- and there's no indication that anyone at the site level was informed of this letter or the medical records, right?
> **A.  There were e-mails that, as I attested earlier, alluded to some of the medical and legal issues relating to the case that were sent to the site -- or I'm sorry, the regional medical directors were copied on that, as I had attested earlier.  That's the only documentation that I'm aware of that I saw.**

> **A. I got the e-mail and I think the letter was referenced. If it was attached and copied and I reviewed that, I'm not sure.**
> Q. So you may have reviewed the letter; you don't know?
> **A. I don't recall if I did or not. If I would have, I would have taken action on it, most likely.**
> Q. Is there any evidence that you took any action based on this letter?
> **A. Not that I have seen, no.**

[12] *Id.*

[13] Trial tr. at 479:15-480:6:

> Q. Did you inform anyone at Pinckneyville about this letter?
> **A. No, I did not.**
> Q. And in 2019, just as before, you're on the phone with someone from Pinckneyville weekly, correct?
> **A. Generally, yes.**
> Q. And you couldn't be bothered to just ask, "What's going on with Antonio Hunter? Got a disturbing communication"?
> **A. I don't know that I agree that I couldn't be bothered. I certainly took my job seriously and my role seriously; I still do. But, as I testified, the follow-up on these types of**

6

understood Dr. Ritz's overarching position on the letter to be that it was not his job to respond.[14])

And during his own counsel's questioning, Dr. Ritz claimed that his only action in response to

Mr. Ebbitt's email about the letter was to "acknowledg[e]" receiving the email.[15]  He denied that

---

> **documents and these types of communications didn't fall under corporate responsibility', it was something we had a process by which the on-site doctors who are the ones who are actually taking care of the patients would have been the ones who would have been forwarded this, usually through our regional medical director team, for follow-up and discussion of these. We at the utilization management team did not drive that process.**

[14] Trial tr. at 467:1-7 (sidebar):

> THE COURT: Well, I just looked back. The Motion in Limine said, "The Court agrees the letter's admissible for the purpose of notice, not for the truth of its contents," and then it said "reserve ruling." But then the other day we talked about that they -- it can come in for notice, he can say he got the e-mail, "I didn't respond, because that's not what I do," which I think is what he said so far.

[15] Trial tr. at 524:2-18:

> Q. Were you one of seven people that was sent an e-mail about that letter?
> **A. Yes.**
> Q. Did you do anything in response to being one of the seven people that was on this e-mail chain?
> **A. As I recall, I would have responded, I think, to Mr. Ebbitt regarding acknowledging it, but in terms of specific actions, I don't recall.**
> Q. Why did you not get personally involved when you were one of the seven people that was included on this e-mail?
> **A. As I had said earlier, the customary practice when these types of things would come in to the corporate office, and especially if they were from attorneys or they were from families, that we had a process that we went through where this information was forwarded usually to the staff on site or regional medical directors and administrative staff to look into it.**

he got "personally involved" and claimed he deferred to a "process" for alerting the on-site providers.[16]

Defense counsel Mr. Harms reiterated this theme in his closing argument. He contended that the 2019 letter was not sent to Dr. Ritz and that the regional medical directors were the ones who were supposed to take action.[17] Dr. Ritz, he said, reasonably deferred to his colleagues.[18]

Following the trial, which ended with a hung jury, Plaintiff moved to compel the production of the emails based on Dr. Ritz's testimony and his counsel's trial argument about them. Dkt. 226. The Court had denied a previous motion on the same topic as moot but not on the merits. Dkt. 221. This time the Court granted the motion to compel, dkt. 233, ordering Defendant to produce the emails, which he did this past Thursday (May 29).

As discussed in more detail below, the emails reveal that Dr. Ritz's testimony in this case is replete with lies and that his counsel's closing argument was grossly misleading at best. *See* Exhibit 1, 6/11/2019 Wexford Emails. It turns out that the 2019 letter *was* attached to the email from Mr. Ebbitt. Moreover, Dr. Ritz was directed to read the letter. In fact, Ritz was the one

---

[16] *Id.*

[17] Trial tr. at 652:6-17:

> Next, the lawyer letter. Judge Rosenstengel gave you instruction -- an instruction, but it's not included in your packet. This letter was offered into evidence for notice purposes only, not as evidence that what's stated in the letter is the truth. This is a letter written by lawyers who were threatening to file a lawsuit. It is not objective. The letter was not sent to Dr. Ritz. He was one of seven recipients of an e-mail that discussed the letter. He deferred to his colleagues. Similarly to the collegial review, the local folks are the ones in the best position to figure out what is going on. Included in the seven people that were sent the e-mail were Illinois medical directors.

[18] *Id.*

person on the email chain whom Mr. Ebbitt wanted to speak with about the letter, and Ritz's response was not a mere acknowledgement of receipt but was instead a promise to call Ebbitt. Most damningly, in a subsequent email in the chain from Dr. Lehman to the regional medical directors, Lehman informed them that *he and Dr. Ritz* were going to handle the situation—not the regional directors, and not Lehman on his own.

Dr. Ritz re-read this correspondence just before being deposed in a case that accuses him of deliberate indifference and seeks punitive damages. His counsel read it too. Ritz then testified and counsel argued as they did, confident Plaintiff would never see the emails.

## ARGUMENT

As the Court held at summary judgment, if Dr. Ritz received the 2019 letter and did not take appropriate action in response, a jury could find that he was deliberately indifferent to Mr. Hunter's serious medical need. *Hunter v. Illinois Dep't of Corr.*, No. 3:21-CV-271-NJR, 2023 WL 6311474, at *7 (S.D. Ill. Sept. 28, 2023). Thus the letter is central to this case, as is how it was disseminated and discussed inside Wexford. But Dr. Ritz's testimony on this crucial subject, detailed above, was false or grossly misleading in many material respects, as were his counsel's arguments.

For starters, the emails reveal that the 2019 letter *was* attached to Mr. Ebbitt's email and that Dr. Ritz was directed to read it, contrary to Dr. Ritz's unequivocal deposition testimony that "no evidence" showed the letter was attached. *Compare id.* at 6 ("Please read the attached letter concerning the above patient. We need to discuss ASAP. . . . If possible, maybe Dr Ritz can call me or I can stop down his office today to briefly discuss in order to determine whether we need a global call or not.") *to supra* fn 7, Ritz 30(b)(6) dep. at 23:5-7 ("Q· · "When Mr. Ebbitt sent you the e-mail related to this letter, was the letter attached to the e-mail?" A· · "There was no

9

evidence of that, no."). It is also impossible to credit Dr. Ritz's testimony that he could not recall whether he received the letter, *see supra* fn 2, when emails he had reviewed just before testifying would have refreshed his recollection on that point, *see supra* fn 1.

The emails also reveal that, in response to Mr. Ebbitt's initial email, Dr. Ritz wrote back "Joe Ill call you." Exhibit 1 at 1. This contradicts Ritz's testimony that he merely "acknowledged" receipt of the email as well as his testimony that he was unaware of any communications about the letter outside the email discussion. *See supra* fn 15; fn 8.

But most disconcerting is that—in response to an email in the chain from one of the regional medical directors—Dr. Lehman wrote, "Steve and I are handling this issue." Exhibit 1 at 5. This contradicts Dr. Ritz's testimony that Dr. Lehman wrote that he would "take care of it" himself, as well as his testimony that he did not know what Lehman meant or did. *See supra* fn 8. What Dr. Lehman actually wrote (clearly after some discussion with Ritz and perhaps Ebbitt) is that he and Dr. Ritz, whose first name is Stephen, *both* would be handling it.[19] The same email also contradicts Dr. Ritz's testimony—and his counsel's assertions—that the regional medical directors likely would have had responsibility for handling Mr. Hunter's situation. *See supra* fn 15 and fn 17. The regional directors were specifically told Ritz and Lehman would handle it, as Defendant and his counsel knew perfectly well when making their false representations in depositions, at summary judgment, and at trial.

It goes without saying that Plaintiff was entitled to truthful testimony from Dr. Ritz about his knowledge of the 2019 letter and his actions with respect to it. That is not what Plaintiff got, and now it is incumbent upon this Court to discourage such false and intentionally misleading testimony, to redress the harm it caused, and to enforce the ethics that govern the legal

---

[19] For Dr. Ritz to hide behind a dead man by misrepresenting the evidence is especially low.

profession.[20] If not for the fortuity of a mistrial and the (rare) grant of a previously denied motion to compel, Defendant and his counsel would never have been caught. A strong deterrent is thus required.

Entering judgment for the opposing party as a sanction is appropriate under the circumstances detailed herein. *See, e.g., Domanus v. Lewicki*, 742 F.3d 290, 302 (7th Cir. 2014) (affirming entry of judgment for plaintiff as a sanction because of defendant's "contumacious conduct," "willfulness," and "bad faith" during discovery); *Dotson v. Bravo*, 202 F.R.D. 559, 575 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003) ("Dotson maintains that the only sanction appropriate on this record is impeachment. Impeachment has little punitive or deterrent effect for obstructive discovery tactics or perjury. Dismissal, *with prejudice*, will have the appropriate deterrent effect. Dismissal will send a strong message to other litigants who abuse the discovery process and who perjure themselves that such misconduct will not be condoned by the courts."); *Brady v. United States*, 877 F. Supp. 444, 453 (C.D. Ill. 1994) (dismissing case as a sanction and observing, "The conduct the Court finds most offensive is Mr. Brady's perjury at his deposition and the evidentiary hearing. Mr. Brady in bad faith twice failed to comply with his obligation to testify truthfully under oath."); *Radecki v. GlaxoSmithKline*, 646 F. Supp. 2d 310,

---

[20] The need for action is all the greater when deception by parties or counsel is part of a pattern, as it is here. *See Domanus*, 742 F.3d at 302 (emphasizing defendant's "conduct as a whole" in deciding that entry of judgment for plaintiff was an appropriate sanction). As the Court is aware, days before the last trial, defense counsel represented to plaintiff's counsel via email that a witness on Plaintiff's will-call list, a Wexford doctor, was too ill with terminal cancer to come to trial. *See* dkts. 204, 211, 218. Plaintiff's counsel accepted that representation and was left with a hole in the evidence, while Defendant gained an empty chair and partial scapegoat. Following the mistrial, Plaintiff moved to take this doctor's deposition to preserve his testimony. Plaintiff then learned that the doctor, though ill, was still working *four days per week* for Wexford. Obviously he could have come to the trial, but his subsequent deposition showed why the defense did not want him there: he was unwilling to take responsibility for Dr. Ritz's decision not to provide treatment to Mr. Hunter. This pattern leads one to wonder what other dirty tricks the defense may have played during this litigation.

319 (D. Conn. 2009), aff'd, 375 F. App'x 46 (2d Cir. 2010) (dismissing case with prejudice as a sanction because "[t]o have the plaintiff in this case pay a monetary penalty and then return to court and present his case before a new jury would give the appearance of tolerating a flagrant affront to the truth-seeking function of adversary proceedings, even if (or perhaps especially if) the court allowed the defendant to use the plaintiff's perjurious testimony from the first trial to attack his credibility") (internal citations and quotation marks omitted); *see also Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488 (9th Cir. 1991) ("Dismissal is an appropriate sanction for falsifying a deposition. Fed.R.Civ.P. 11, as well as the court's inherent powers, can be called upon to redress such mendacity.").

Entry of judgment against Defendant is a particularly apt sanction because the emails about the 2019 letter go a long way toward proving exactly what the Court determined would make Dr. Ritz liable in this case: his knowledge that Mr. Hunter's condition persisted in 2019 and his conscious decision to do nothing about it. Plaintiff should not have to re-try his liability case when honest testimony from Defendant could well have led to a different outcome the first time around—if not with the jury, then potentially as a matter of law. The Court's resources would be much better spent on things other than giving Defendant an undeserved second chance to convince a jury he is not responsible for Mr. Hunter's years of needless suffering. Dr. Ritz *is* responsible for that suffering, and he has lied and cheated for years, abetted by his counsel, to hide this fact. Such egregious misconduct must not be tolerated.

## CONCLUSION

For the reasons given above, Plaintiff asks the Court, as a sanction for defense misconduct, to enter judgment in his favor. Plaintiff also requests any other relief the Court

deems appropriate. In light of the trial date's nearness (June 9), Plaintiff further requests that the Court set a hearing on this motion to take place in the coming week.

Dated: May 31, 2025.                                         Respectfully submitted,

                                                             /s/ Julia Rickert

                                                             Jon Loevy
                                                             Locke Bowman
                                                             Julia Rickert
                                                             Maria Makar
                                                             LOEVY & LOEVY
                                                             311 N. Aberdeen St., 3rd fl.
                                                             Chicago, IL 60607
                                                             (312) 243-5900
                                                             julia@loevy.com

                                                             *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Julia Rickert, an attorney, hereby certify that on May 31, 2025, I caused the foregoing document to be served on all counsel of record using the Court's CM/ECF system.

                                                             /s/ Julia Rickert
                                                             *One of Plaintiffs' Attorneys*