IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANTONIO HUNTER,

        Plaintiff,

v.

STEPHEN RITZ,

        Defendant.

Case No. 3:21-CV-271-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is the renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure filed by Defendant Dr. Stephen Ritz. Defendant made an oral motion at trial and filed a supplemental brief upon the conclusion of trial. (Doc. 269). Plaintiff did not file a written response. For the following reasons, Defendant's motion is denied.

### BACKGROUND

Plaintiff Antonio Hunter, a prisoner in custody of the Illinois Department of Corrections at the time he filed this lawsuit, alleged that Defendant Dr. Stephen Ritz violated his Eighth Amendment constitutional rights by exhibiting deliberate indifference to his need for a surgical consult regarding his recurrent rectal prolapse.[1] (Doc. 1). Hunter's claim against Dr. Ritz proceeded to a jury trial in July 2024, but ended in a mistrial when the jury could not reach a verdict. (Doc. 190). Upon retrial of Hunter's claim in June 2025, a jury found for Hunter on his claim of deliberate indifference and awarded $4,000,000 in compensatory

---

[1] Hunter also sued other prison officials who are no longer in the case.

damages and $1,000,000 in punitive damages. (Doc. 266).

In his motion for judgment as a matter of law, Dr. Ritz argues that Hunter failed to produce competent and substantial evidence supporting each and every element of his deliberate indifference claim. (Doc. 269). He further asserts that Hunter did not set forth competent and substantial evidence to support an award of punitive damages. Dr. Ritz asks the Court to vacate the jury's verdict and direct a verdict in his favor.

## LEGAL STANDARD

Under Rule 50(a) of the Federal Rules of Civil Procedure, a district court may enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). The law imposes a high standard for overturning a jury verdict. *Pierson v. Hartley*, 391 F.3d 898, 903 (7th Cir. 2004). In reviewing a motion under Rule 50, the court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Id.* A jury's verdict will only be overturned if no reasonable juror could have found in the prevailing party's favor. *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011).

## DISCUSSION

**A.    Deliberate Indifference**

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661–62 (7th Cir. 2016) (quoting *Estelle v. Gamble*,

429 U.S. 97, 104 (1976)). "To prevail on a deliberate-indifference claim, the plaintiff must prove that he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Id.* at 662 (citation omitted). A prison official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To meet the subjective requirement, the plaintiff must provide evidence that the office "*actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

At trial, Hunter presented evidence from which a reasonably jury could conclude both that he suffered from an objectively serious medical condition and that Dr. Ritz knew of and disregarded the substantial risk of harm to Hunter's health.

With regard to whether Hunter had a serious medical need, the jury saw medical records and heard testimony that Hunter had rectal prolapse surgery in 2012. (Doc. 274 at p. 89). The surgery "helped a little bit," but Hunter's trouble using the bathroom ultimately came back. (*Id.* at p. 91). At that point, his condition was manageable because he could eat enough fruit and fiber. (*Id.*). By 2017, however, Hunter had entered prison and his diet changed. (*Id.* at p. 92). He could no longer take fiber supplements like Metamucil, so he had to strain to empty his bowels, causing his prolapse to pop out of his anus. (*Id.*). Hunter testified that his pain level was 10 out of 10 when going to the bathroom. (*Id.* at p. 95). Simply climbing to a top bunk would cause his prolapse to "peek out." (*Id.* at p. 98). Hunter explained that for four years, from 2018 to 2022, when using the bathroom he had to use his "left middle finger to lift the prolapse up and pull the crap down. Then I had a tissue in my right hand. Every time I pulled, I wipe and keep going until my knees get tired from squatting, so I would

stop. I used to do that like six, seven times a day. And then at the same time, on a bad day the feces get to spraying, so you spray on my sink, all that stuff, on the wall. But then when I stop I just to have to put the tissue back there to stop the mucus from coming down." (*Id.* at p. 118). He could not sit on the toilet because the prolapse "would be in the water." (*Id.* at p. 119). After using the toilet, Hunter would have to push the prolapse back into his body then use a toilet paper plug to stop blood, mucus, and feces from leaking out of his anus. (*Id.* at p. 126).

In addition to Hunter's own testimony, the jury heard testimony from Dr. Percy Myers, a doctor at Pinckneyville Correctional Center, who made an urgent referral in April 2018 for Hunter to have a "surgical consultation for correction" after symptoms of Hunter's rectal prolapse returned. (Doc. 274 at p. 37). The jury also heard testimony from Dr. Jerrold Noble that when he saw Hunter on May 29, 2019, for a separate issue, he noted that Hunter had "quite an impressive rectal prolapse." (Doc. 274 at pp. 9, 11). Dr. Noble independently remembered Hunter's prolapse despite having treated tens of thousands of patients in his career. (*Id.* at p. 9). He recorded Hunter has having a "rectal prolapse with straining" with "no rectal tone." (*Id.* at p. 14). Dr. Venketeswara Poola also testified that he treated Hunter for recurrent rectal prolapse, a condition where one's "rectum comes out in the anus and it stays there." (Doc. 275 at p. 11). And Dr. Ritz himself testified that a serious medical need is one that requires treatment, and that a person suffering from rectal prolapse can require treatment. (Doc. 273 at pp. 41, 174). Thus, the Court finds there was sufficient evidence for a reasonable jury to conclude that Hunter was suffering from an objectively serious medical condition.

As to the subjective component of deliberate indifference—whether Dr. Ritz actually

knew of and disregarded a substantial risk of harm to Hunter's health—Dr. Ritz argues that Hunter did not present evidence that he consciously failed to take reasonable measures to provide treatment for any serious medical need, or that Hunter was harmed by Dr. Ritz's actions or inaction.

Dr. Ritz contends that when Dr. Myers referred Hunter for a surgical consult in 2018 to address his recurrent rectal prolapse, Dr. Ritz denied the consultation in collegial review in favor of an alternative treatment plan that included obtaining Hunter's prior medical records. (Doc. 273 at pp. 59). Dr. Ritz asserts that although Hunter was provided with an authorization form to obtain those records, and although Hunter testified that he knew his prior surgery occurred at Cook County Hospital, he simply indicated "I don't know" on the form. Dr. Ritz argues that the only conclusions the jury could draw from this evidence was that (1) Hunter lied while giving testimony under oath in court, or (2) Hunter lied on the form and was being deliberately obstructive to those seeking to provide him with medical care.

The authorization form, however, did not ask Hunter where his prior surgery occurred. The form, entered into evidence, asked Hunter to authorize that "a copy of my MEDICAL RECORDS, currently in the custody of: _____ be TRANSFERRED to _____." (Def't Ex. 243). Hunter wrote "I don't know . . . he probably talking about my file . . . the state should have that." (*Id.*). Hunter also testified that the authorization came to him through institutional mail, that no one explained what they were looking for, and that he did not know where his records were. (Doc. 274 at pp. 138-39). Hunter explained he was letting them know they already had his medical records, that he was not attempting to hide anything about his medical history from any Wexford doctors, and that he wanted the doctors to have all the information they needed to get him help. (*Id.* at pp. 139-40). Thus, the

Court is not persuaded by Dr. Ritz's argument that Hunter was either lying on the stand or lying on the authorization form and, thus, there is no evidence the records were available.

Hunter also presented evidence that his attorneys sent a letter in 2019 to Wexford, which was forwarded to Dr. Ritz and others via email from Wexford's Risk Management Director, Joe Ebbitt. (*Id.* at pp. 67-68; Pl. Ex. 24). The letter, addressed to Ebbitt and Dr. Steven Meeks with the Illinois Department of Corrections, noted that Hunter was previously diagnosed with a rectal prolapse, that his symptoms returned in 2017, that Dr. Myers urgently referred Hunter to a specialist to determine whether his rectal prolapse required surgical correction, and that Dr. Ritz or another Wexford physician denied the referral due to a need for Mr. Hunter's prior medical records. (*Id.* at pp. 69-70). The letter also *included Hunter's relevant medical records* and asked that the attorneys be notified if additional documentation was required. (*Id.* at p. 71).

The email sent by Ebbitt to Dr. Ritz and others within Wexford stated: "Please read the attached letter concerning the above patient. We need to discuss ASAP. . . If possible, maybe Dr. Ritz can call me or I can stop down his office today to briefly discuss in order to determine whether we need a global call or not." (Pl. Ex. 74). Hunter presented evidence that, when asked about the email chain in a prior deposition, Dr. Ritz testified that Dr. Lehman, Wexford's Chief Medical Officer at the time who is now deceased, responded to the email and said he was "going to take care of it." (Doc. 273 at p. 89). Dr. Ritz confirmed in his deposition testimony that the only person with information about what Dr. Lehman was going to do was Dr. Lehman himself. (*Id.* at p. 92).

In actuality, however, Dr. Ritz had responded to the email by saying, "Joe [Ebbitt], I'll call you." (*Id.* at p. 94). And the email response from Dr. Lehman stated not that he alone

would take care of it, but that "Steve and I are handling the issue." (*Id.* at p. 95). Dr. Ritz confirmed that his first name is Steve and that he was the only Steve on the email chain. (*Id.* at pp. 95-96). Dr. Ritz admitted he did not quote Dr. Lehman verbatim in his deposition and that he did not do anything after receiving the letter to ensure Hunter was evaluated in any way. (*Id.* at pp. 105-06). Specifically, Dr. Ritz admitted that he was the decisionmaker in the collegial review process, that he did not tell anyone at Pinckneyville that he had received the 2019 attorney letter or Hunter's relevant medical records, and that he "didn't take specific action, no." (*Id.* at p. 74).

Finally, Dr. Ritz argues that after his request for a surgical consult was denied, Hunter never sought any further care for his alleged rectal prolapse between July 2018 and December 2021, and thus, the alleged indifference could not have caused Hunter any harm. Hunter testified, however, that once Wexford denied his surgical consultation in 2018, there was no point in submitting additional sick call slips. (Doc. 274 at p. 199-200). Additionally, Hunter saw Dr. Myers every three or four months in the hypertension clinic, and he would tell Dr. Myers about his rectal prolapse every time. (*Id.* at p. 200). Dr. Myers told him: "It's just not going to happen." (Doc. 274 at p. 110). And, of course, the jury heard Hunter's own testimony regarding the suffering he endured while his rectal prolapse remained untreated, and Dr. Poola's testimony that a rectal prolapse cannot be corrected without surgery. (Doc. 275 at pp. 11-12).

Based on this evidence, the Court concludes a reasonable jury could find that Dr. Ritz actually knew of and disregarded a substantial risk of harm to Hunter when he refused to allow Hunter to receive a surgical consultation for his rectal prolapse.

B.  **Punitive Damages**

Dr. Ritz also asserts that Hunter failed to set forth sufficient evidence for a jury to award punitive damages. Specifically, Dr. Ritz argues the standard for punitive damages requires willful and wanton conduct indicating a high degree of moral blame, akin to the type of blame involved in criminal intent. Moreover, he argues, willful does not mean intentional conduct; it means knowledge of unlawfulness or reckless indifference to the law. Because Hunter did not set forth competent and substantial evidence demonstrating that Dr. Ritz's conduct was willful and wanton, above and beyond the minimum to be held liable for deliberate indifference, he is not entitled to punitive damages.

Again, the Court disagrees. Dr. Ritz is a medical doctor who agreed on direct examination that a rectal prolapse can cause extreme pain and impact a person's quality of life. (Doc. 273 at p. 42). He also confirmed that a rectal prolapse does not usually heal on its own, that it can require a person to use his hands to defecate, that it can cause fecal incontinence and leakage, and that, ultimately, a rectal prolapse can threaten a person's life. (*Id.* at pp. 44-45). Hunter then set forth evidence showing that Dr. Ritz first became aware of Hunter's need for a surgical consult in late April 2018 after Dr. Myers submitted an urgent referral. Dr. Ritz denied that consultation in favor of an alternative treatment plan that included first obtaining Hunter's prior surgical records. But when presented with those very records in June 2019, Dr. Ritz admitted he took no action to ensure Hunter received a surgical consultation to treat his rectal prolapse. In other words, despite fully understanding the nature and potential consequences of Hunter's rectal prolapse, Dr. Ritz chose not to allow Hunter to see a surgeon—even after he received the medical records that he claimed to want as part of an alternative treatment plan. On these facts, a reasonable jury could find that

Dr. Ritz's conduct was willful and wanton.

## Conclusion

Because Plaintiff Antonio Hunter presented a legally sufficient evidentiary basis for a reasonable jury to find in his favor, the Motion for Judgment as a Matter of Law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure filed by Defendant Dr. Stephen Ritz (Doc. 269) is **DENIED**.

The Clerk of Court is **DIRECTED** to enter judgment in favor of Antonio Hunter and against Dr. Stephen Ritz in the amount of $ 5,000,000. Hunter is further awarded his costs.

**IT IS SO ORDERED.**

DATED:   August 4, 2025

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**